**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0271n.06
Filed: April 8, 2009

No. 07-3373

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| MARCUS BLALOCK, | ) | ON APPEAL FROM THE |
|  | ) | UNITED STATES DISTRICT |
| **Petitioner-Appellant,** | ) | COURT FOR THE NORTHERN |
|  | ) | DISTRICT OF OHIO |
| v. | ) |  |
|  | ) |  |
| JULIUS WILSON, WARDEN, | ) |  |
|  | ) |  |
| **Respondent-Appellee.** | ) |  |

Before:  SUHRHEINRICH, GILMAN, and WHITE, Circuit Judges.

**WHITE, Circuit Judge.**

Appellant Marcus Blalock appeals the district court's denial of his petition for a federal writ of habeas corpus.  An Ohio state court convicted Blalock of aggravated murder with a firearms specification, kidnaping with a firearms specification, aggravated robbery with a firearms specification, and having a weapon while under disability.  Blalock appealed and collaterally challenged his conviction within the state system.  He then filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Ohio.  The district court denied the writ but granted Blalock leave to appeal on four grounds.  Because Blalock has not shown a constitutional violation, we **AFFIRM**.

**I.  BACKGROUND**

In May 2001, a Cuyahoga County grand jury indicted Blalock, Dion Johnson, Ernest McCauley, and Arketa Willis on three counts of aggravated murder with felony murder and firearms specifications, kidnaping with a firearms specification, aggravated robbery with a firearms specification, tampering with evidence, and obstruction of justice. It also indicted Blalock, Johnson, and McCauley on weapons charges. The court consolidated the cases for pre-trial purposes. The state dismissed the murder, kidnaping, and robbery charges against Willis in exchange for her plea of guilty of obstruction of justice and tampering with evidence and her agreement to testify truthfully against Blalock. Blalock was tried separately.[1] Willis testified against him; McCauley and Johnson did not testify.[2]

**A. Trial**

Blalock's trial was held in August 2001. The Ohio Court of Appeals, Eighth District, reviewing the case in Blalock's direct appeal, summarized the relevant facts:

> At approximately 8:00 a.m. on Saturday March 24, 2001, the badly burned body of Howard Rose was found in the back of a pickup truck which had itself been badly damaged by fire on the eastbound side of Interstate 90 just west of Exit 6 in Pennsylvania. Tire tracks indicated that another vehicle had been stopped behind the truck and proceeded east on Interstate 90. Some fabric, parts of a watch and a thin necklace and a cross were recovered from the bed of the truck. Forensic examination

---

[1]The court consolidated the counts against Blalock for trial, removed the felony murder specifications from the indictment, and reduced one of the aggravated murder counts to murder. Blalock waived his right to a jury on the weapons charge.

[2]McCauley was tried after Blalock. He waived his right to a jury and the court directed a verdict of acquittal on the aggravated murder, kidnaping, and aggravated robbery charges and found him guilty of the weapons charge. McCauley then pleaded guilty of tampering with evidence and obstruction of justice.

2

revealed that the cause of death was a single gunshot wound to the back of the head at point blank range.

The truck was registered to a Lenor Lemar. Through this connection, the Pennsylvania State Police located and interviewed family and friends of the victim, Howard Rose.

During the course of the investigation, the state police discovered that the Maple Heights Police had responded to an incident on the night of March 23 at the home of Arketa Willis. Willis's aunt and neighbor, Dorothy Evans, called police at approximately 11:20 p.m. to report suspicious activity at Willis's house, where there were two men parked in the driveway. Police responded. The car left the scene. Police pursued it and apprehended the two men inside--Dion Johnson ["Johnson"] and Ernest McCauley ["McCauley"]. McCauley had blood on his clothes. They were both arrested.

Police entered the house and found coagulated blood and a pager with blood on it. Blood was also observed on the driveway. The blood on the pager was later tested and found to be Rose's.

Willis was interviewed by the police on April 6. At first, she told them that the blood on the driveway was from a dog fight, but she later abandoned that story and told the police that she saw the victim dead on her bed. She also told them she was afraid of appellant and he was the one who killed Rose. Police searched her home and found that the bedroom was freshly painted and had a new mattress and box spring; the driveway had been washed with bleach.

Willis was interviewed again on April 9 and told police that appellant took her car and took the body to Pennsylvania. She retracted this statement later, and admitted that she was with appellant when they took the body to Pennsylvania.

Willis testified that she met Rose at Rose's grandfather's house on March 23. When she got there, she received a call from appellant asking her if she knew anyone who had drugs. Willis turned the call over to Rose, who she knew to sell drugs.

Rose and Willis drove to Lorain. They made several stops, then went to a restaurant for dinner. She saw that Rose had a substantial amount of cash.

Rose took Willis home, where she bathed and dressed for work. Rose told Willis that he had told appellant to meet him at Willis' house that night. Appellant came to the house before Willis left. Willis then went to work driving Rose's truck.

Willis expected Rose to come to get his truck at the Big Family Lounge where she worked. When Rose didn't come, Willis tried to call appellant from work but got no answer. After calling four or five times at various numbers, appellant finally answered. Willis asked where Rose was. Appellant told her that he was busy and she should call back. Approximately thirty minutes later, she called appellant again, and he told her he would call her back. Appellant called less than half an hour later, telling Willis to come home and bring the truck.

When Willis went home, she found a car parked in front of her house with two people inside. One was Ernest McCauley, whom she knew. All three of them entered the house together. She saw Rose's body lying on her bed in blood. Appellant told her that he had to "do" Rose.

Appellant and McCauley carried the body in blankets through the kitchen and out the side door to the truck. With the help of the third person, Dion Johnson, they got the body into the truck. Ms. Willis drove the truck away as the police arrived. She went to a gas station, where she called the Big Family and had a friend, Omar, come to pick her up and take her back to work. She left the truck parked on a side street.

When Willis got off work, she went home, wiped blood off a doorway and poured water on the blood on the driveway. She and Omar then went to the police station. The police told her to go home, where she was met by police officers. They asked her about the blood in the driveway, and she told them there was a dog fight.

Willis and Omar then went to appellant's house. Willis had seen appellant and his girlfriend, Angie, on her way home from work. Appellant put a gas can in the trunk of Willis's car and they drove to the truck. Appellant drove the truck and she and Omar followed.

They traveled east on Interstate 90. At a rest stop, appellant removed the gas can from Willis's car and took it with him in the truck. Near daylight, appellant pulled the truck to the side of the road. Willis pulled in behind him. The truck burst into flames and appellant jumped out. He got in Willis's car and they continued to drive east to New York City, where they stayed not more than four hours. They drove back that evening but got lost, finally arriving in Cleveland around 8:00 a.m. on Sunday.

At the conclusion of the trial, the jury found appellant guilty of all charges. The court found him guilty of possession of a weapon while under disability.

4

In Case No. 407194, the court sentenced appellant to a term of fifteen years to life imprisonment on the murder charge; life imprisonment with eligibility for parole in twenty years on each of the aggravated murder charges; ten years' imprisonment on each of the aggravated robbery and kidnaping charges; and twelve months imprisonment on the weapons charge. All of these sentences were to be served concurrently with one another and consecutive to the mandatory three year sentence on the firearms specifications in each of the first five charges, which were merged for purposes of sentencing.

In Case No. 407947, the court sentenced appellant to concurrent terms of five years on the tampering with evidence and obstructing justice charges. This sentence was to be served consecutive to the sentence in Case No. 407194.

*State v. Blalock*, 2002 WL 2027520, at *1-3 (Ohio Ct. App. Sept. 5, 2002).

**B. Direct Appeal**

Represented by counsel, Blalock appealed, asserting fourteen assignments of error. Two of

those assignments overlap with issues Blalock now appeals before this court. They are:

I.      DEFENDANT WAS DENIED DUE PROCESS OF LAW WHEN THE COURT DID NOT DISCLOSE THE TRANSCRIPT OF THE GRAND JURY TO DEFENSE COUNSEL

* * *

IV.      DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE WHEN THE COURT WOULD NOT ALLOW EVIDENCE CONCERNING ARKETA WILLIS' ADMISSION TO SHOOTING HOWARD ROSE

(Joint Appendix (J.A.) at 860, 867.)[3]

On September 5, 2002 the Ohio Court of Appeals affirmed Blalock's convictions and

sentences for murder, aggravated murder, kidnaping, aggravated robbery, and having a weapon while

---

[3]The remaining claims are listed in the appendix to the Court of Appeals' decision. *State v. Blalock*, 2002 WL 2027520, at 10-11 (Ohio Ct. App. Sept. 5, 2002).

under disability. It reversed Blalock's conviction of obstruction of justice because the state failed to prove an underlying crime committed by another. *Blalock*, 2002 WL 2027520, at *9. The state agreed with Blalock that the trial court "failed to make the requisite findings necessary to impose consecutive sentences," leading the court to remand for resentencing on the tampering with evidence charge.[4] *Id.* at 10.

Blalock, represented by counsel, sought leave to appeal the decision to the Ohio Supreme Court, raising eleven propositions of law. Two of the propositions stated claims that overlap with issues Blalock currently appeals. They are:

PROPOSITION OF LAW NO. I
A DEFENDANT IS DENIED DUE PROCESS OF LAW WHEN HIS INDICTMENT HAS BEEN SECURED BY THE MANIPULATION OF THE GRAND JURY PROCESS BY INDICTING FOUR (4) PEOPLE FOR THE SAME OFFENSE KNOWING THAT THERE WAS NO PROBABLE CAUSE IN ORDER TO COERCE ONE OR MORE OF THE CO-DEFENDANTS TO TESTIFY.

* * *

PROPOSITION OF LAW NO. IV
A DEFENDANT IS DENIED HIS CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE WHEN THE COURT WOULD NOT ALLOW EVIDENCE CONCERNING AN ADMISSION BY A CO-DEFENDANT TO THE KILLING OF THE DECEDENT.

---

[4]On April 23, 2003 the trial court resentenced Blalock to five years on the tampering with evidence charge. (J.A. at 1215.) Blalock appealed the sentence. The Ohio Court of Appeals affirmed the trial court and the Ohio Supreme Court denied leave to appeal and dismissed the appeal as not involving a substantial constitutional question. *State v. Blalock*, 2003 WL 22922426 (Ohio Ct. App. Dec. 11, 2003); (J.A. at 1300 (Ohio Supreme Court Order).)

(J.A. at 997, 999-1000.)[5]

On February 19, 2003, the Ohio Supreme Court denied leave and dismissed Blalock's appeal

as not involving a substantial constitutional question. (J.A. at 1022.)

## C. State Post-Conviction Relief

In February 2002, Blalock filed a motion for a new trial or, in the alternative, post-conviction

relief. Blalock argued that after his trial, co-defendants Johnson and McCauley made statements at

McCauley's trial and during their presentence report interviews that exculpated Blalock.[6] Among

other things, Blalock claimed that this new evidence showed that his trial contained perjured

testimony, denying him fundamental fairness and due process. On October 15, 2002, the trial court

denied Blalock's motions, explaining that he cited "no new information which would warrant a new

trial." (J.A. at 1065.)

Blalock appealed the trial court's denial, raising two assignments of error, both of which

relate to the ninth ground for relief in Blalock's habeas appeal:

> DEFENDANT WAS DENIED DUE PROCESS OF LAW WHEN THE COURT
> DID NOT AWARD A NEW TRIAL.
>
> * * *
>
> DEFENDANT WAS DENIED DUE PROCESS OF LAW WHEN THE COURT
> DID NOT AT LEAST GRANT AN EVIDENTIARY HEARING CONCERNING
> DEFENDANT'S ALLEGATIONS.

---

[5]The remaining propositions of law can be found in Blalock's brief to the Ohio Supreme
Court at J.A. 985-1003.

[6]Johnson's and McCauley's statements explained their and Blalock's roles in moving the
victim's body and blamed the murder on Willis.

(J.A. at 1089, 1099.)

On June 12, 2003, the Ohio Court of Appeals affirmed the trial court's opinion, finding that

the statements in question did not constitute new evidence because: 1) they "offer[ed] no new

revelations" and 2) the trial court did not abuse its discretion in failing to conduct an evidentiary

hearing on the motion. *State v. Blalock*, 2003 WL 21360467, at *2 (Ohio Ct. App. June 12, 2003).

Blalock timely appealed to the Ohio Supreme Court, raising the following propositions of

law in his memorandum in support of jurisdiction:

> PROPOSITION OF LAW NO. I
> A DEFENDANT IS DENIED DUE PROCESS OF LAW WHEN A COURT FAILS
> TO AWARD A NEW TRIAL WHEN THE DEFENDANT HAD DISCOVERED
> THAT HE WAS CONVICTED ON PERJURED TESTIMONY.
>
> * * *
>
> PROPOSITION OF LAW NO. II
> A DEFENDANT IS DENIED DUE PROCESS OF LAW WHEN THE COURT
> OVERRULES THE MOTION FOR A NEW TRIAL BASED ON NEWLY
> DISCOVERED EVIDENCE WITHOUT AN EVIDENTIARY HEARING.

(J.A. at 1186, 1189.)

On November 19, 2003 the Ohio Supreme Court denied leave to appeal and dismissed

Blalock's case as not involving a substantial constitutional question.

**D. Federal Habeas Petition**

Blalock filed a petition for a federal writ of habeas corpus on October 28, 2004. He asserted

nine grounds for relief, four of which are the subject of this appeal:[7]

---

[7]The other grounds were:

**Ground One:**          **SIXTH AND FOURTEENTH AMENDMENT**
**Supporting Facts:** Petitioner requested a transcript of a grand jury proceedings [sic]. The court ordered the grand jury proceedings but would not disclose it to counsel. Later the grand jury transcript was produced showing that the grand jury proceedings were manipulated. Misrepresentations were made in order to secure an

———————————

**Ground Two:**          **SIXTH AND FOURTEEN [sic] AMENDMENT**
**Supporting Facts:** Petitioner was denied a fair trial when the court permitted the prosecutor to bolster the testimony of Arketa Willis because she had been cross-examined and had admitted that she made a number of inconsistent statements. Moreover, petitioner was not allowed his constitutional of [sic] confrontation and cross-examination of various witnesses.
**Ground Four:**          **FOURTEENTH AMENDMENT**
**Supporting Facts:** Petitioner was denied a fair trial by reason of improper prosecutorial argument.

**Ground Five:**          **SIXTH AND FOURTEENTH AMENDMENT**
**Supporting Facts:** Petitioner was denied a fair trial and a fair and impartial jury when the court did not take proper action and determine the cause of distress by a juror when the verdicts were announced in open court.

**Ground Six:**          **FOURTEENTH AMENDMENT**
**Supporting Facts:** Petitioner was denied due process of law when the court did not even fully inform the jury concerning the issues in the case. The court did not give any instruction concerning alibi. The court did not give any instruction concerning the willful lies and falsehoods of Arketa Willis. The court gave instructions which resulted in impermissible and unconstitutional presumptions thus relieving the state of its burden or [sic] proof.

**Ground Seven:**          **FOURTEENTH AMENDMENT**
**Supporting Facts:** Petitioner was denied due process of law when the court refused to grant a motion of judgment of acquittal as there was insufficient evidence to permit a rational factfinder to return a verdict of guilty. In addition, petitioner was charged under duplicitous and multiplicitous indictment [sic] and there was no requirement that the jury unanimously agree on the elements of the offense this was [sic] before it could return verdicts of guilty.

(J.A. at 11-14.)

indictment against petitioner. This denied petitioner his rights under the Sixth and Fourteenth Amendments.[8]

**Ground Three:** **SIXTH AND FOURTEENTH AMENDMENT**
**Supporting Facts:** Petitioner was denied his right to present a defense. Petitioner attempted to offer evidence that Arketa Willis had admitted that she was the one responsible for the death of Howard Rose. However, the court would not allow this evidence.

**Ground Eight:** **FOURTEENTH AMENDMENT**
**Supporting Facts:** Petitioner was denied due process of law when the prosecutor was allowed to argue at petitioner's trial that petitioner was the one who shot the decedent Howard Rose. However, at a trial of a co-defendant, the same prosecutor argued that this person was the one who had shot Howard Rose.

**Ground Nine:** **FOURTEENTH AMENDMENT**
**Supporting Facts:** Petitioner was denied due process of law when he was not awarded a new trial. Petitioner produced evidence, after the trial in this case, showing beyond a reasonable doubt that he was actually innocent of the offenses. After this was presented to the court petitioner was not granted a new trial. This denied petitioner his right of due process of law because he was sentenced to a term of life imprisonment when it was shown that he was actually innocent of the offenses.

(J.A. at 11-14.)

In support of his petition, Blalock presents a version of the events of March 23, 2001 that highlights Willis's, McCauley's, and Johnson's interactions with police that evening. Blalock also claims he was in Cleveland on the weekend he is alleged to have driven Rose's truck to Pennsylvania and that he has photo and testamentary evidence to prove it.

On May 13, 2005, the magistrate judge recommended the district court deny Blalock's petition. After concluding that Blalock had "exhausted direct appeals for all his claims" and had no

---

[8]In some portions of the text, this court has reformatted the grounds from the manner in which the appellant presented them on page five of the standard "Petition Under 28 USC § 2254 for Writ of Habeas Corpus by a Person in State Custody." (*See* J.A. at 11-14.)

remaining state remedies, the magistrate judge concluded that Blalock procedurally defaulted on his fifth, sixth, eighth, and portions of his seventh grounds for relief. (*See* J.A. at 144-150 (applying the four-step analysis from *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986), to decide whether petitioner defaulted and whether the court should excuse the default).) The magistrate judge then assessed each of the remaining grounds for relief, ultimately concluding that the state-court decisions leading to each of the alleged errors were not contrary to clearly established federal law or based on an unreasonable determination of the facts in light of the evidence.[9] (*See* J.A. at 151, 153-54, 157, 159, 162, 166, 168, 171.)

On June 22, 2005, Blalock objected "to each and every finding made by the Magistrate Judge." (*Id.* at 173.) Before the district court could consider these objections, Blalock filed a motion to expand the record, in order to require the warden of the facility at which McCauley was incarcerated "to produce a tape recording of a phone conversation between Ernest McCauley, who was a co-defendant of petitioner at trial and Arketa Willis who was a witness at petitioner's trial."[10] (*Id.* at 217.) According to Blalock's motion, on the recording "Arketa Willis testified that she shot Howard Rose point blank" and that "the only involvement that petitioner had was when he was called over to the home after the death of Howard Rose." (*Id.* at 218.) Appellee Julius Wilson, Warden, filed a response opposing the expansion of the record, but also filed a recording of the

---

[9]This standard of review comes from the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which modified 28 U.S.C. 2254(d). *See infra* Section II.A.

[10]Blalock's description of McCauley as a "co-defendant of petitioner at trial" is inaccurate. *See* notes 1and 2, *supra*, and accompanying text.

11

conversations in question. Before issuing a decision on Blalock's objections to the Report and Recommendation, the district court referred the expansion issue to the magistrate judge.

The magistrate judge concluded that Wilson's filing of the recording "made moot the question of whether the record should be expanded," moving on to "whether the evidence in the taped conversations would change the magistrate judge's Report and Recommendation to deny Blalock's petition." (J.A. at 503.) She then extensively quoted portions of a transcript of the recorded conversations, some of which contained McCauley's expressions of guilt about involving Blalock in the matter.[11] At one point McCauley said to Willis:

> MR. McCAULEY: That really bothers me.
> If it was a different situation it probably wouldn't even bother me. But it bothers me because what you not seeing is I asked him to help me to save you. And at the cost of saving you, he lost his life. That's what bothers me more than anything, baby, and that's what I need you to think about. That's why – that's what bothers me more than anything. I mean, that really hurts me.
>
> MS. WILLIS: Uh-huh.
>
> MR. McCAULEY: You understand? Do you kind of feel what I'm saying now?
>
> MS. WILLIS: Yeah.
>
> MR. McCAULEY: Now, see you didn't probably look at it like that, did you?
>
> MS. WILLIS: Yeah, I did thought about that but I mmmm.
>
> MR. McCAULEY: Oh, you have?
>
> MS. WILLIS: Yeah.

---

[11]The entirety of the quotations are contained in Section II of the second Report and Recommendation. *See Blalock v. Wilson*, 2006 WL 1866666, at *8-20 (N.D. Ohio June 30, 2006). The entire transcript can be found in Volume II of the Joint Appendix. (J.A. at 266-500.)

(J.A. at 504.)  At one point McCauley questioned Willis about what he did not know about the

murder:

> MR. McCAULEY:  I don't know everything evidently.  Just like one letter I wrote, let me give you an example, right?
>
> MS. WILLIS:  Uh-huh.
>
> MR. McCAULEY:  I wrote you a letter and I asked you what was to gain in it.  And you just told me right now you don't even want to talk about it, you'll let me know when the time is right, you'll just let me know.  And I never went back to that, asking about 'cause I was said okay, well she'll let me know.  And you just never told me,
>
> MS. WILLIS:  Uh.  There ain't no gain in it. There was none.
>
> MR. McCAULEY:  There wasn't no gain in it at all?
>
> MS. WILLIS:  No.
>
> MR. McCAULEY:  Well if there weren't no gain in it and it lead me to believe that you must have hated him just as much as you hated Mark.  That assumed to be true, baby?
>
> MS. WILLIS:  No.

(J.A. at 507.)  The discussion continued in a subsequent call:[12]

> MR. McCAULEY: . . . When you said people thinking, you said they thinking you what now?
>
> MS. WILLIS:  Stupid.
>
> MR. McCAULEY:  Stupid for what?

---

[12]It appears that inmates at McCauley's facility can talk for fifteen minutes before the call is cut off and the inmate has to re-dial.  Also, an MCI recording occasionally interrupts the conversation to remind the parties that the call originated "from an Ohio correctional institution and may be recorded or monitored."  (*See* J.A. at 275.)  These interruptions are transcribed as "MCI interruption."

13

MS. WILLIS: Stupid for lying.

MR. McCAULEY: Just be real with me. This is why I talk to you because I want to believe that you going to be all the way real with me no matter what you say. Just tell me how you feel. Go ahead.

MS. WILLIS: Like when I even thought about trying to help Mark --

MR. McCAULEY: Right.

MS. WILLIS: And I knew it was like, can get me in trouble. They was like it's gone, I guess it was like every person was for theirself and it just – I happened to get only the four years. It could have been the other way and I could have been getting a lot of time.

MR. McCAULEY: What you mean --

MS. WILLIS: They say that I should --

MR. McCAULEY: Okay. Go ahead.

MS. WILLIS: So they're thinking I should just do my four and then don't worry about it.

MR. McCAULEY: Right, right. But see they're not looking at the – see again, every person wasn't for theirself. Everybody told a story because you started off telling a story. Remember I told you that?

MS. WILLIS: Right.

MR. McCAULEY: Okay.

MS. WILLIS: That's what I'm saying. Then it's like --

MR. McCAULEY: Let me help you understand it better. Let me help you understand it better, alright?

MS. WILLIS: Yeah.

\* \* \*

MR. McCAULEY: Nobody was going to testify against you. I explained that clearly in my letter. There was --

MS. WILLIS:  Yeah, but I didn't know that then.

MR. McCAULEY:  Okay but now, thank you.

MS. WILLIS: It was like everybody – I felt everybody – when everybody said a story after me, I felt like it was like every man for theirself and when I had got the deal and I was like well, I know they going to say I told like 50 different stories.  So I ain't think – I'm for real in my heart of heart, I ain't think no jury would believe me to convict anybody.  Know what I mean?

MR. McCAULEY:  I know that.  I know that.

MS. WILLIS:  But it turned around that they did.  I mean that's why I didn't even cry or nothing or be, you know, like remorseful and all that.

MR. McCAULEY:  Right.

MS. WILLIS:  Cause I'm thinking they ain't going to believe nothing, but they did.

MR. McCAULEY: Right.

MS. WILLIS:  And I'm like, dang. Know what I mean? I couldn't believe it myself and I'm like, well, I'm going to take this deal 'cause I don't want to go on trial, so I took a deal.

(J.A. at 507-09.)  Later, McCauley returned to his concerns about what actually happened and how:

MR. McCAULEY:  That's what lead me to help you.  You say, don't worry about that. If the police come down on me I'm going to take out, I'm going to take out. Where'd the turning come in?  Where did you decide to turn?  Because I'm saying to myself, if it wasn't Blalock helping us, then it make me feel like it would have been me.  Which you would have did – what you would have turned – would I have been the one in.

MS. WILLIS:  (inaudible.)

MR. McCAULEY:  Would I have been the one faced – when did you take the turn at?  When did you decide to take the turn and put it on him?

MS. WILLIS:  I don't know.

MR. McCAULEY:  That's the part I'm lost in. That's where I'm really lost at.

MS. WILLIS:  It wouldn't have been you.

(J.A. at 512.)  Later, they again discussed Blalock:

MS. WILLIS:  I really don't care and I don't care about him, because of all the things he did –

MR. McCAULEY:  Right.

(MCI interruption.)

MR. McCAULEY:  Yeah.

MS. WILLIS:  But I still be thinking about him.  You know?

MR. McCAULEY:  Let me say this to you – let me say this. I know it's a lot to think about.  Don't ever think I don't think that.  You hear me?

MS. WILLIS:  Uh-huh.

MR. McCAULEY:  What I think, is something I told you in a letter that I wrote you. God, [sic] will take care of that, no matter what.  No matter what a person do, you reap what you sow.  You understand what I'm saying?

MS. WILLIS:  Yes.  That's why sometimes I feel, like, well, maybe that's where they supposed to be.

MR. McCAULEY:  No.  You know what I think?  No, that's because it was a decision made on you.

MS. WILLIS:  Me?

MR. McCAULEY:  Yeah. Let me say – let me tell you something what I really think. I think, I think, right what you don't see and is bigger that what you probably see, 'cause you not looking into the bigger picture.  I think once that happens, let say for instance, he get out.  Right?  Let's say a week or two.

MS. WILLIS: Uh-huh.

16

MR. McCAULEY:  Let's say three weeks, a year from now, whatever, right?

MS. WILLIS:  Uh-huh.

MR. McCAULEY:  And it's because of what you said, or what you, because you, you know, you let the truth be known, right?

MS. WILLIS:  Uh-huh.

MR. McCAULEY:  I think it would give you more than you realize a sense of freedom.

MS. WILLIS:  Uh-huh.

MR. McCAULEY:  And even though you right now – you say, you don't care.  No matter –

MS. WILLIS:  I do for real. I do.

MR. McCAULEY:  I know this already, so quit – quit doing me like this.  This is what I do know.  I do know you really do.  After all your hate and anger, you still do care.

MS. WILLIS:  Uh-huh.

MR. McCAULEY:  And I know this, because that's who I am.  And that's how I come to learn about you. I know you got a conscience. I know  you can care about certain things, no matter what you indeed.[13]  Okay, somethings [sic] you can't take back, maybe, but I know you care.  Somewhere down inside, you do care and you can make all the difference in the world.  You understand what I'm saying?

MS. WILLIS:  Uh-huh.

MR. McCAULEY:  Listen.  It's not even in his life, in my life. I was saying this the other day in my mind.  I was saying, she going to realize if you – if you free, you done took a soul.  Right?

---

[13]McCauley actually said, "done did" rather than "indeed." [Footnote five in Magistrate Judge's Report and Recommendation]

17

MS. WILLIS:  Uh-huh.

MR. McCAULEY:  But you can free two souls to save another soul.  Do you know what that means?

MS. WILLIS:  What?

MR. McCAULEY:  Okay, you took a soul.

MS. WILLIS:  Right.

MR. McCAULEY:  Which would be Howard.

MS. WILLIS:  Uh-huh.

MR. McCAULEY:  You can save two souls, which would be me and Mark --

MS. WILLIS:  Uh-huh.

MR. McCAULEY:  To free a soul. Who was to free the soul?

MS. WILLIS:  Is mine in bondage?

(J.A. at 516-18.)  The discussion continued in this vein, with Willis never explicitly confessing, though at one point explaining the killing could not have been manslaughter because she saw the injury and "[i]t's like a perfect shot."[14] (J.A. at 392.)  McCauley and Willis discussed that they were surprised that the jury convicted Blalock, and Willis stated, apparently in reference to her attorneys and/or the police, that she "lied to them to the last day."  (J.A. at 523-25.)

The magistrate judge ultimately concluded that a "showing of actual innocence based on newly discovered evidence is not sufficient to warrant habeas relief."  (J.A. at 525 (citing and

---

[14]This portion of the transcript is misquoted in the magistrate judge's Report and Recommendation, with the speakers switched.  (*See* J.A. at 518-19.)

extensively quoting *Herrera v. Collins*, 506 U.S. 390, 400-401 (1993).) Nevertheless Blalock's new evidence of actual innocence – in combination with the previously presented statements McCauley and Johnson made during their presentence report interviews and at McCauley's trial – convinced the magistrate judge that Blalock made "a showing of innocence sufficient for the court to consider those claims which Blalock procedurally defaulted." (J.A. at 527.) *See also Schlup v. Dole*, 513 U.S. 298, 315-16 (1995) (explaining that evidence of innocence can serve as a "gateway" to consideration of otherwise defaulted claims because a habeas court presented with such evidence cannot have confidence in the outcome of a trial unless it can ensure that it "was free of nonharmless constitutional error").

In the rest of her Report, the magistrate judge reconsidered Blalock's fifth, sixth, and eighth grounds, as well as the remaining portions of his seventh ground for relief. She ultimately concluded that these grounds – like those analyzed in her previous Report and Recommendation – did not warrant relief under federal constitutional law and AEDPA's standard of review. (J.A. at 535, 536, 538, 540, 541, 542, 545).

The district court adopted the magistrate judge's Report and Recommendation. *Blalock v. Wilson*, 2006 WL 1866666, at \*7 (N.D. Ohio June 30, 2006). With regard to the Report's assessment of Blalock's second, fourth, fifth, sixth, and seventh grounds for relief, the district court adopted the magistrate judge's conclusions without additional comment. With regard to the first, third, eighth, and ninth grounds (those at issue in this appeal), the court provided additional analysis in response to Blalock's objections to the Report and Recommendation and granted a certificate of appealability.

19

Blalock filed a motion to alter or amend judgment, which the court denied on August 22, 2006. (J.A. at 601-06.)

Blalock subsequently appealed to this court, which denied his application for a partial certificate of appealability on his second, fourth, fifth, sixth, and seventh grounds for relief.

## II. ANALYSIS

### A. Jurisdiction and Standard of Review

The district court had jurisdiction to review Blalock's habeas application under 28 U.S.C. § 2241(a) and (d). This court reviews the district court's denial of the writ under 28 U.S.C. §§ 1291, 2253(a).

In an appeal from a decision to deny a petition for writ of habeas corpus, this court reviews the district court's legal conclusions de novo and factual findings for clear error. *Franklin v. Bradshaw*, 545 F.3d 409, 413 (6th Cir. 2008) (citing *Hill v. Hofbauer*, 337 F.3d 706, 710 (6th Cir. 2003)).

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) modified 28 U.S.C. § 2254, providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). United States Supreme Court holdings, not dicta, at the time of the petitioner's conviction define "clearly established" law. *Harris v. Stovall*, 212 F.3d 940, 943-44 (6th Cir. 2000).

Courts give independent meaning to the "contrary to" and "unreasonable application of" tests in § 2254(d)(1). *See Williams v. Taylor*, 529 U.S. 362, 405 (2000) (emphasizing the difference between the two tests). A decision is "contrary to" clearly established federal law if it is "substantially different from the relevant precedent of" the Supreme Court or if it "confronts a set of facts that are materially indistinguishable" from those in a case before the Supreme Court "and nevertheless arrives at a result different" from the Court's holding. *Id.* at 405-06. A decision involves an "unreasonable application" of federal law when: 1) the state court identifies the correct legal rule based on Supreme Court precedent "but unreasonably applies it to the facts of the particular state prisoner's case" or 2) "the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407; *see also, e.g.*, *Jells v. Mitchell*, 538 F.3d 478, 487 (6th Cir. 2008).

The state court's factual determinations "shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). An appellant, however, may rebut "the presumption of correctness by clear and convincing evidence." *Id.*

These statutes and precedents provide specific standards for assessing state court decisions. Defaulted and unreviewed claims, however, present a special situation because there is no state

21

decision to review. In her second Report, the magistrate judge purported to evaluate "Blalock's defaulted claims under the deferential standard of review accorded the state court's determination of a prisoner's constitutional claim." (J.A. at 529.) When reviewing petitioner's eighth ground for relief, however, the magistrate judge held that Blalock defaulted because he "never presented to the state court his claim that the alleged varying claims by the prosecutor regarding who shot the victim violated Blalock's right to due process." (J.A. at 150.) As a result, the claim was never "adjudicated on the merits in State court proceedings."[15] 28 U.S.C. § 2254(d).

Blalock's perjury claim presents a similar challenge. In his state collateral challenge, Blalock argued that new evidence showed his conviction relied on perjured testimony. *Blalock*, 2003 WL 21360467, at *1. The state trial court rejected this claim because Blalock cited "no new information which would warrant a new trial." (J.A. at 1065.) The Ohio Court of Appeals affirmed on the basis that the "new" evidence in question (the statements of co-defendants McCauley and Johnson during their presentence investigation report interviews) did not constitute "newly discovered evidence";

---

[15]This would not necessarily be the case if the petitioner's default was the result of: 1) his failure to properly highlight the federal nature of a claim in his state appeals, or 2) his failure to raise an issue on *direct* appeal, raising it for the first time during state collateral review. In such cases there often is a state court decision on point, despite petitioner's default. *See Filaggi v. Bagley*, 445 F.3d 851, 854 (6th Cir. 2006) (allowing for a modified AEDPA review when a state court decision contains an analysis bearing "some similarity" to the requisite constitutional analysis); *Abdus-Samad v. Bell*, 420 F.3d 614, 627-29 (6th Cir. 2005) (assuming – despite the district court's finding that petitioner defaulted on his claim by not properly raising the federal issue in state court – that petitioner fairly presented his federal claim and holding that the state court's conclusion (based on state law) did not involve an "unreasonable application" of federal law); *Wickline v. Mitchell*, 319 F.3d 813, 822-23 (6th Cir. 2003) (holding petitioner's claim procedurally defaulted "because he never presented the claim on direct appeal, raising it for the first time in his state post-conviction proceedings" but noting that even if he had not defaulted, the state court's alternative ruling in its collateral review was "not contrary to or an unreasonable application" of federal law).

the court did not reach the question whether the evidence would have entitled Blalock to a new trial had it been newly discovered. *Blalock*, 2003 WL 21360467, at \*2. In this habeas proceeding, Blalock's "perjured testimony" claim rests on the statements in the presentence reports *and* the new recordings of conversations between McCauley and Willis.[16] The state courts have not had an opportunity to examine or decide the impact of the transcript of the conversations between Willis and McCauley.[17]

The absence of state-court review of these claims muddles the application of AEDPA. In the past, this court has applied "modified AEDPA deference" when "the state court adjudicated the

---

[16]Though neither party mentions it, the posture of this claim raises exhaustion concerns. However, because we hold that Blalock cannot obtain relief on his perjured testimony claim unless he presents evidence that the state *knowingly* introduced the perjured testimony (see Section II.B.), Blalock's new evidence does not "fundamentally alter[] the legal claim" he made before the Ohio Court of Appeals. *Pinholster v. Ayers*, 525 F.3d 742, 765 (9th Cir. 2008); *see Vasquez v. Hillery*, 474 U.S. 254, 257-58 (1986) (explaining that the Court has "never held that presentation of additional facts to the district court, pursuant to that court's directions, evades the exhaustion requirement when the prisoner has presented the substance of his claim to the state courts"); *Boyko v. Parke*, 259 F.3d 781, 789 (7th Cir. 2001) (habeas applicant had exhausted state remedies, despite the presentation of new evidence in federal court, as the new evidence did "not change the substance" of his argument for relief); *see also Sosa v. Johnson*, 198 F.3d 240; 1999 WL 824456, at \*4 (5th Cir. Sept. 27, 1999) (unpublished disposition) ("Sosa has presented us with seven full volumes containing ninety-four exhibits, most of which are new. Though his present claims largely may rest on the same constitutional ground as when earlier presented to the state courts, Sosa has fundamentally altered them by augmenting them to this degree."); *cf.* 28 U.S.C. §2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

[17]Our consideration of Blalock's claim here is limited to whether the additional evidence, together with Blalock's assertions that he is actually innocent and that his conviction was based on perjured testimony, establish a violation of Blalock's constitutional right to due process. It is a separate question for the Ohio courts whether the additional evidence provided by the transcript of the conversations between Willis and McCauley entitles Blalock to a new trial under Ohio law. *See infra* note 23.

23

claim but with little analysis on the substantive constitutional issue." *Davie v. Mitchell*, 547 F.3d 297, 315 (6th Cir. 2008) (internal citations and quotation marks omitted) (quoting *Vasquez v. Jones*, 496 F.3d 564, 569 (6th Cir. 2007)). In such a situation, the court conducts "a careful and independent review of the record and applicable law," not reversing the court's ultimate decision "unless the state court's decision is contrary to or an unreasonable application of federal law." *Id.*

A federal court, however, cannot review the state court's decision when: 1) the petitioner defaulted by failing to raise the claim in state court, or 2) the state court never reached a decision on the constitutional portion of the claim. In such circumstances "any attempt to determine whether the state court decision 'was contrary to, or involved an unreasonable application of clearly established federal law,' would be futile." *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003) (internal citation omitted); *see also Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003) (noting that [the AEDPA] "by its own terms is applicable only to habeas claims that were 'adjudicated on the merits in State court . . . .' Where, as here, the state court did not assess the merits of a claim properly raised in a habeas petition, the deference due under AEDPA does not apply." (internal citation omitted)); *Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003) (noting that "unusual circumstances" meant that the federal court had "no alternative but to conduct an independent review of the claim, because there is no foundation in the state court proceedings for AEDPA deference.")

The unique circumstances of the claims at issue – Blalock's eighth ground and his perjury allegation – require that we "'exercise our independent judgment' and review the claim[s] *de novo*." *McKenzie*, 326 F.3d at 727 (quoting *Hain v. Gibson*, 287 F.3d 1224, 1229 (10th Cir.2002)).

**B. Due Process Violation: Evidence of Actual Innocence and Perjured Testimony**

24

Blalock claims the conversations between McCauley and Willis show his actual innocence and bolster his argument that Willis's testimony denied him due process. Blalock's actual innocence claim rests on the Supreme Court's decisions in *Kuhlmann v. Wilson*, 477 U.S. 436 (1986), *Murray v. Carrier*, 477 U.S. 478 (1986), and *Schlup v. Delo*, 513 U.S. 298 (1995). These cases allow a petitioner to revive a procedurally defaulted habeas claim when he can show "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup*, 513 U.S. at 327 (quoting *Murray*, 477 U.S. at 496). In this manner, a showing of actual innocence – regardless of its provenance or basis – can serve as a gateway, allowing a habeas court to consider an otherwise defaulted claim. The district court looked to this precedent when it held that Blalock's post-trial evidence made a sufficient showing of actual innocence to allow it to consider Blalock's procedurally defaulted claims.

The gateway precedent, however, does not support that a showing of actual innocence can serve as an independent ground for habeas relief. Justice Rehnquist's oft-quoted passage on this issue explains:

> Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding. Chief Justice Warren made this clear in *Townsend v. Sain*, *supra*, 372 U.S., at 317, 83 S.Ct., at 759 (emphasis added):
>
> > "Where newly discovered evidence is alleged in a habeas application, evidence which could not reasonably have been presented to the state trier of facts, the federal court must grant an evidentiary hearing. Of course, such evidence must bear upon the constitutionality of the applicant's detention; *the existence merely of newly discovered evidence relevant to the guilt of a state prisoner is not a ground for relief on federal habeas corpus*."

25

This rule is grounded in the principle that federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact. *See, e.g.*, *Moore v. Dempsey*, 261 U.S. 86, 87-88, 43 S.Ct. 265, 265, 67 L.Ed. 543 (1923) (Holmes, J.) ("[W]hat we have to deal with [on habeas review] is not the petitioners' innocence or guilt but solely the question whether their constitutional rights have been preserved"); *Hyde v. Shine*, 199 U.S. 62, 84, 25 S.Ct. 760, 764, 50 L.Ed. 90 (1905) ("[I]t is well settled that upon *habeas corpus* the court will not weigh the evidence") (emphasis in original); *Ex parte Terry*, 128 U.S. 289, 305, 9 S.Ct. 77, 80, 32 L.Ed. 405 (1888) ("As the writ of *habeas corpus* does not perform the office of a writ of error or an appeal, [the facts establishing guilt] cannot be re-examined or reviewed in this collateral proceeding") (emphasis in original).

More recent authority construing federal habeas statutes speaks in a similar vein. "Federal courts are not forums in which to relitigate state trials." *Barefoot v. Estelle*, 463 U.S. 880, 887, 103 S.Ct. 3383, 3391, 77 L.Ed.2d 1090 (1983). The guilt or innocence determination in state criminal trials is "a decisive and portentous event." *Wainwright v. Sykes*, 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977). "Society's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens." *Ibid.* Few rulings would be more disruptive of our federal system than to provide for federal habeas review of freestanding claims of actual innocence.

*Herrera v. Collins*, 506 U.S. 390, 400-01 (1993). *But see id.* at 417 (assuming "for the sake of argument . . . that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim").

According to Blalock, his actual innocence claim differs from other such claims because it also alleges "petitioner's conviction was based on perjured testimony." (Br. for Pet'r at 14.) In short, Blalock uses the recorded conversations to challenge the veracity and legality of Willis's testimony, while at the same time emphasizing that she was "the key government witness" in an

otherwise "less than overwhelming" case against him.[18] (*Id.* at 15, 18.) This claim aligns with the

first assignment of error in Blalock's state collateral challenge (on appeal here as the ninth ground

for relief in Section II.F.).[19] Yet it does not provide petitioner with the due process constitutional

claim he desires.

---

[18]The arguments challenging Willis's testimony also revisit other claims that the district court did not certify for appeal. For example, Blalock points out that he was denied due process when: 1) the prosecutor was allowed to bolster Willis's testimony on redirect; 2) the court did not allow him "the opportunity to fully probe the bias of Arketa Willis"; and 3) the prosecutor "improperly expressed his personal opinion that Aketa [sic] was truthful" and that Blalock was a murderer. (Br. for Pet'r at 15-17; *see also* J.A.154-57; 159-62 (magistrate judge's analysis of Blalock's second and fourth grounds for relief); J.A. at 589 (district judge's denial of certification for grounds two, four, five, six, and seven).) Because the lower court did not certify these claims, this opinion does not reach them.

[19]This is not the exact argument Blalock made when he moved to expand the record. At that time, he pressed that the recorded conversations would "establish the actual innocence of petitioner" and moved for the expansion "in the interest of justice . . . so that an innocent person will not have to remain in jail under a life sentence." (J.A. at 218.) Likewise, in the Notice of the Filing that accompanied his submission of the transcript, Blalock claimed the court was "required to determine whether petitioner in fact committed the offenses for which he had been convicted." (*Id.* at 221.)

After the magistrate judge recommended the district court reject Blalock's claim of actual innocence because it did not state a valid ground for habeas relief, Blalock shifted his argument. In his objections to the Report and Recommendation, Blalock explained that the recording proved his conviction was based on perjured testimony and that "[b]y allowing the use of false testimony to stand uncorrected, the due process rights to a fair trial of petitioner have been violated." (J.A. 548 (citing *Giglio v. United States*, 405 U.S. 150, 154-55 (1971); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *Brown v. Wainwright*, 785 F.2d 1457 (11th Cir. 1986).) Blalock may have failed to raise this argument earlier, however, because he expected that after the magistrate judge granted the motion to expand the record he would have another opportunity to file a brief on the impact of the new evidence. (*See* J.A. at 503 (magistrate judge holding that respondent's filing of the requested recording "made moot the question of whether the record should be expanded" and moving on to the question whether the new evidence would change her initial Report and Recommendation).) In any case, the district court's order followed the claims as listed in the petitioner's original habeas petition and the magistrate judge's report, causing it to pass over the perjury argument. (*See* J.A. at 579-87.)

Blalock's due process claim relies on *Brady* case law. *Brady v. Maryland*, 373 U.S. 83 (1963). As he correctly points out, in *Mooney v. Holohan*, 294 U.S. 103, 112 (1935), and *Giglio v. United States*, 405 U.S. 150, 154-55 (1971), the Supreme Court established "that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" *Giglio*, 405 U.S. at 153 (quoting *Mooney*, 294 U.S. at 112); *see also United States v. Agurs*, 427 U.S. 97, 103 (1976) ("In the first [*Brady*] situation, . . . the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury."). Based on the same logic, the Court held that it is a violation of due process for the state to withhold exculpatory evidence if there is a reasonable probability that disclosure of said evidence would have produced a different result at trial. *Kyles v. Whitley*, 514 U.S. 419, 421-22 (1995); *Brady*, 373 U.S. 83.[20]

Blalock argues that his case falls within these lines of authority, but fails to concede one important distinction. In *Brady* and its progeny the state had knowledge or possession of information or evidence it did not disclose to the defense. *See, e.g.*, *Agurs*, 427 U.S. at 103 (explaining that each situation in which *Brady* applies "involves the discovery, after trial of information which had been known to the prosecution but unknown to the defense"); *Giglio*, 405 U.S. at 154 (discussing the burdens of actions and knowledge of individuals being attributed to an institution, but noting that "[t]o the extent this places a burden on the large prosecution offices, procedures and regulations can

---

[20]There is some debate as to whether a *Brady* claim is distinct from a *Giglio* claim. *See Banks v. Dretke*, 540 U.S. 668, 690, n.11 (2004). For the purposes of analyzing, and rejecting, Blalock's arguments about both cases, the factors that unify *Brady* and *Giglio* outweigh the distinctions.

be established to carry that burden and insure communication of all relevant information on each case to every lawyer who deals with it").[21] Likewise, *Brady* cases involving the introduction of false evidence express an explicit concern for the "*knowing* use of perjured testimony." *Strickler v. Greene*, 527 U.S. 263, 281 & n.19 (1999) (emphasis added); *see also, e.g.*, *Giglio*, 405 U.S. at 153 (presentation of "known false evidence" violates the Constitution). Blalock presents no evidence that the prosecutor believed Willis's testimony was perjurious.

In several filings, Blalock compares his situation to that of the appellant in *Schlup*, a habeas petitioner who also presented "new evidence . . . which cast doubt on [his] guilt." (*See, e.g.*, Br. for Pet'r at 19-21.) In *Schlup*, however, the new evidence of innocence did not create or support a separate constitutional claim. Rather, consistent with the procedure the district court followed in this case, the new evidence overcame Schlup's prior default and allowed the court to independently consider his "contention that the ineffectiveness of his counsel, *see Strickland v. Washington*, 466 U.S. 668 (1984), and the withholding of evidence by the prosecution, *see Brady v. Maryland*, 373 U.S. 83 (1963), denied him the full panoply of protections afforded to criminal defendants by the Constitution." *Schlup*, 513 U.S. at 314 (portions of internal citations omitted). Schlup's "claim for relief depend[ed] critically on the validity of his *Strickland* and *Brady* claims." *Id.* at 315. The court held that Schlup's allegation of actual innocence – supported by new affidavits – provided an avenue for arguing the merits of his otherwise defaulted constitutional error claims. *Id.* at 316-17.

---

[21]*See also Bank v. Dretke*, 540 U.S. 668, 693 (2004) (noting that the government "knew of, but kept back" certain exculpatory evidence); *Kyles*, 514 U.S. 419, 437 (1995) (holding prosecutors responsible for "any favorable evidence known to the others acting on the government's behalf in the case, including the police").

As previously explained, our consideration of the instant claim does not entail review of the state court's decision under AEDPA's "clearly established federal law" standard, because the state court did not consider this claim. 28 U.S.C. § 2244(d)(1). Nevertheless, Sixth Circuit precedent establishes that the government must have "knowingly" used perjured testimony at trial in order for the presentation of that testimony to constitute a violation of due process. *Burks v. Egeler*, 512 F.2d 221, 229-30 (6th Cir. 1975) (requiring "a showing of prosecutorial involvement in the perjury" in order for the testimony to constitute a due process violation).[22]

Since Blalock has not shown that the prosecutor played a knowing role in the presentation of the allegedly perjured testimony, this court rejects Blalock's claim that Willis's testimony could, in and of itself, violate the Constitution.[23]

### C. Due Process Violation: Manipulation of the Grand Jury

---

[22]*See also King v. Trippett*, 192 F.3d 517, 522-23 (6th Cir. 1999) (noting that "To be entitled to habeas relief, petitioner must show that the prosecution knowingly used perjured testimony.") (citing *Burks*, 512 F.2d at 224); *Norris v. Schotten*, 146 F.3d 314, 331 (6th Cir. 1998) (stating "Appellant has also presented no reason for this court to believe that the prosecutors intentionally allowed any witness to perjure herself on the stand."). *But see Sanders v. Sullivan*, 863 F.2d 218, 224 (2d Cir. 1988) (rejecting the Sixth Circuit's opinion in *Burks* because "[t]here is no logical reason to limit a due process violation to state action defined as prosecutorial knowledge of perjured testimony or even false testimony by witnesses with some affiliation with a government agency. Such a rule elevates form over substance.").

[23]During oral argument, counsel indicated that Blalock was also using this newly discovered evidence to seek some form of relief in state court. To the degree that additional evidence obtained from that effort provides him with a valid habeas claim, the outcome of this opinion does not preclude such a claim. For example, Blalock's discovery of evidence that the state intentionally presented perjured testimony would create new issues that, given the unique circumstances of this case, could meet the requirements of 28 U.S.C. § 2244(b)-(d).

In his first ground for relief, Blalock argues that the state's indictment of all four co-defendants was intended to "put pressure on the individuals to have someone implicate one of the remaining individuals. It so happened that Arketa Willis was the one who implicated petitioner in the death of Howard Rose." (Br. for Pet'r at 31.) According to Blalock, this procedure resulted in an indictment without probable cause, in violation of the Constitution.

When the state court reviewed this issue on direct appeal, defense counsel did not have access to the grand jury transcript. Therefore, in its review, the state court focused on Blalock's allegation that the trial court denied him due process of law when it refused to disclose the transcript of the grand jury proceedings:

> Appellant first argues that the court erred by denying his request to review the grand jury transcript. He contends that the grand jury process was abused because Detective Joseph Hribar, the investigating police officer, had testified at a preliminary hearing that he did not know who killed Rose. Apparently, appellant asks us to infer that Hribar still did not know who killed Rose when Hribar testified before the grand jury, and therefore there was no probable cause to indict appellant.

> "[A]n accused is not entitled to see grand jury transcripts unless the ends of justice require it and he shows that 'a particularized need for disclosure exists which outweighs the need for secrecy.'" *State v. Benge* (1996), 75 Ohio St.3d 136, 145, 661 N.E.2d 1019 (quoting *State v. Greer* (1981), 66 Ohio St.2d 139, 420 N.E.2d 982). "When the circumstances reveal a probability that the failure to provide the grand jury testimony will deny the defendant a fair trial, grand jury proceedings may be disclosed." *State v. Sellards* (1985), 17 Ohio St.3d 169, 173, 478 N.E.2d 781.

> Appellant's speculation about the content of Detective Hribar's grand jury testimony challenges the basis for the grand jury's finding of probable cause. However, "[t]he grand jury's sources of information are widely drawn, and the validity of an indictment is not affected by the character of the evidence considered. Thus, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence." *United States v. Calandra* (1974), 414 U.S. 338, 344-45, 94 S.Ct. 613, 38 L.Ed.2d 561. "An indictment returned by a legally constituted and unbiased grand jury, like an

> information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits." *Villasino v. Maxwell* (1963), 174 Ohio St. 483, 485, 190 N.E.2d 265. Consequently, a challenge to the grand jury's finding of probable cause does not demonstrate a particularized need for disclosure of the testimony. The first assignment of error is overruled. *State v. Brown* (1988), 38 Ohio St.3d 305, 308, 528 N.E.2d 523; *State v. Davis* (1988), 38 Ohio St.3d 361, 528 N.E.2d 925.

*Blalock*, 2002 WL 2027520, at *3-4. (*See also* J.A. at 853, 860-62 (Appellant's Br. on appeal to the Ohio Court of Appeals).)

Now that Blalock has access to the transcript, he has shifted his argument, alleging that the issue is no longer "whether [the transcript] should have been produced but what it did show after it was produced." (Br. for Pet'r at 32.) Quoting select portions of the transcript, Blalock alleges "it was obvious that there was not probable cause" and "the grand jury process was abused by the prosecutor to secure this indictment in order to bring undue pressure on others to become state witnesses." (*Id.* at 33.). Blalock fails to acknowledge that while Detective Ehrbar[24] did not claim to know who killed Rose, he provided the grand jury with a comprehensive recounting of Willis's statements to the police. (*See* J.A. at 616-620 (Detective Ehrbar's grand jury testimony relating Willis's version of the events); J.A. at 621 (Ehrbar's grand jury testimony regarding the differences between Willis, McCauley, and Johnson's versions of the events).)

Blalock also fails to cite any clearly established federal law to support his post-trial attack on the indictment. Instead, he cites cases with different procedural and factual circumstances. *See, e.g., Bank of Nova Scotia v. United States*, 487 U.S. 250 (1988) (assessing the power of a court to

---

[24]While the Ohio Court of Appeals opinion identified the detective in question as Detective "Hribar" other documentation appears to correctly identify him as Detective "Ehrbar."

grant requests for dismissal of an indictment before the conclusion of trial); *Vasquez v. Hilliary*, 474 U.S. 254, 264 (1986) (holding that a judge's systemic exclusion of racial minorities from the grand jury compelled the dismissal of the indictment). In contrast, there is case law requiring that a defendant show significant misconduct before a court can find that an indictment undermined the fairness of the ensuing trial. In the past, this court has held that an appellant "must demonstrate that 'prosecutorial misconduct is a long-standing or common problem in grand jury proceedings in [the] district'" in order to obtain the dismissal of an indictment for alleged prosecutorial misconduct. *United States v. Azad*, 809 F.2d 291, 294 (6th Cir. 1986) (quoting *United States v. Griffith*, 756 F.2d 1244, 1249 (6th Cir. 1985)); *see also United States v. Calandra*, 414 U.S. 338, 344-45 (1974) ("[T]he validity of an indictment is not affected by the character of the evidence considered. Thus, an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence."); *United States v. Collins*, 1991 WL 23558, at *6 (6th Cir. Feb. 26, 1991) (unpublished disposition) ("Incidents before the grand jury do not affect the fairness of the trial. Therefore, this circuit applies a strict standard for dismissal of an indictment because of alleged prosecutorial misconduct before the grand jury."). Assuming these cases enunciate clearly established federal law, Blalock fails to make the required showing.

We find no error in the lower court's conclusion that Blalock failed to establish a violation of clearly established federal law in his first ground for relief.

**D. Constitutional Right to Present a Defense: Presentation of Evidence at Trial**

33

At trial, Blalock requested that the court allow him to present evidence of a statement Willis made to McCauley, in which Willis allegedly admitted that she shot Rose. Blalock challenges the trial court's rejection of this evidence in his third ground for habeas relief.[25]

The state appellate court reviewed this issue on direct appeal as part of Blalock's fourth assignment of error:

> Appellant argues the court erred by excluding an out-of-court statement by co-defendant Ernest McCauley that Willis admitted to him that she killed Rose. McCauley did not testify in this case. Willis did. An out of court statement by one person (McCauley) about an out-of-court statement by another person (Willis) is double hearsay.
>
> We are aware of no exception to the hearsay rule which would allow the admission of McCauley's out of court statement to the police. The statement would clearly have been "offered in evidence to prove the truth of the matter asserted," that is, that Willis killed Rose. McCauley's statement to police implicating Willis clearly does not further a conspiracy and therefore cannot be considered a non-hearsay co-conspirator's statement. Evid.R. 801(D)(2); *State v. Carter* (1995), 72 Ohio St.3d 545, 651 N.E.2d 965, paragraph four of the syllabus. Even though McCauley did not testify at trial and was probably "unavailable" within the meaning of Evid.R. 804(A)(1) because he remained subject to prosecution, his statement did not meet any of the exceptions of Evid.R. 804(B).
>
> Even if McCauley's statement to the police were admissible, Willis's statement to McCauley was not. Again, the statement would have been offered in evidence to prove the truth of the matter asserted, that Willis killed Rose. *See* Evid.R. 801(C). This statement by Willis was not made under oath subject to cross examination. Evid.R. 801(D)(1). None of the exceptions set forth in Evid.R. 803 applies. Because she testified at trial, Evid.R. 804 is inapplicable.
>
> Therefore, the court did not err by excluding McCauley's out-of-court statement that Willis admitted she killed Rose.

---

[25]Blalock does not contend that the state court restricted his efforts to cross-examine Willis with regard to this alleged confession.

*Blalock*, 2002 WL 2027520, at *5-6.

According to Blalock, because the police never explicitly asked Willis whether she killed Howard Rose, she never denied having done so. Consequently, her admission to McCauley is "significant." (Br. for Pet'r at 26.) Furthermore, Blalock appears to argue that Willis's frequent lies, constantly shifting story, and "sweetheart deal to plea to obstruction of justice and tampering with evidence," made Willis' testimony less reliable and therefore an appropriate target for hearsay impeachment evidence. (*Id.* at 27.)

Federal habeas courts can review state court evidentiary decisions "only for consistency with due process." *Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *see also Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Blalock cites *Chambers v. Mississippi*, 410 U.S. 284 (1973), to support his argument that the significance of the testimony raised a due process right that should have trumped state-court hearsay concerns. In *Chambers*, petitioner Leon Chambers wanted to present evidence that a third party, Gable McDonald, had committed the crime in question. *Id.* at 292. As part of this effort, Chambers attempted to present testimony of three witnesses to whom McDonald had confessed. *Id.* at 292-93. The trial court, upholding the state's hearsay objections, refused to allow the testimony. *Id.* at 293.

Holding that "the hearsay rule may not be applied mechanistically to defeat the ends of justice," the Supreme Court explained that the specific "facts and circumstances" of the case required the testimony be allowed. *Id.* at 302-03. The exclusion of the evidence "coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional

and fundamental standards of due process," which include "the right to a fair opportunity to defend against the State's accusations." *Id.* at 294, 302.

Blalock's proposed evidence, in contrast with the testimony in *Chambers*, is *double* hearsay. This is particularly relevant because the *Chambers* Court based its conclusion on the contextual reliability of the statements in question, which were "in a very real sense self-incriminatory and unquestionably against interest." *Id.* at 300-01.

In the present case, a police officer, rather than the person to whom Willis allegedly made the statement, would have testified. Furthermore, McCauley's statement – explaining that Willis confessed to the crime – is not "unquestionably against interest." It was very much in McCauley's interest to blame Willis. This greatly diminishes the reliability of the statement. *See Chia v. Cambra*, 360 F.3d 997, 1004-05 (9th Cir. 2004) (noting the strong indicia of reliability given that the statement exculpated the defendant while inculpating the declarant).

For these reasons, this court upholds the lower court's denial of the writ on petitioner's third ground for relief.

**E. Due Process Violation: Prosecutor's Inconsistent Positions**

In his eighth ground for relief, Blalock claims that the prosecutor took unconstitutionally inconsistent positions in two separate trials, violating due process. In Blalock's trial, the prosecutor alleged that petitioner was responsible for Rose's death. Yet, according to Blalock, the prosecutor alleged that McCauley was the responsible party when he prosecuted the latter defendant for his involvement in the murder.

The district court identified the primary flaw in this claim: Blalock fails to cite any evidence regarding what the prosecutor argued at McCauley's trial. (J.A. at 542 (Magistrate Judge's Report and Recommendation), 585 (District Judge's Order).) The magistrate judge also observed that, contrary to Blalock's claim, the state court opinion responding to McCauley's appeal presents facts consistent with Blalock's prosecution. *See State v. McCauley*, 2003 WL 21419183, at \*1 (Ohio Ct. App. June 19, 2003) (unpublished disposition) ("On March 23, 2001, Marcus Blalock shot and killed Howard Rose during a meeting for a drug transaction."), *rev'd on other grounds*, *State v. McCauley*, 104 Ohio St.3d 158 (2004); *cf. id.* (noting that the state indicted McCauley – along with Blalock, Johnson, and Willis – on charges of aggravated murder, but that the court directed a verdict of acquittal on the murder charge). Therefore, even without the application of AEDPA deference, Blalock's claim is insufficient. Blalock provides no evidence of the violation he alleges. *Cf.* 28 U.S.C. §2254(e)(2) (explaining that if a habeas "applicant has failed to develop the factual basis of a claim in State court proceedings," the court can hold an evidentiary hearing only in limited circumstances).[26]

---

[26]Notably, Blalock also fails to provide any "clearly established" Supreme Court or Sixth Circuit precedent showing that such a prosecutorial strategy would violate a defendant's due process rights. Blalock's citations include *Bradshaw v. Stumpf*, 545 U.S. 175, 190 (2005) (Souter, J., concurring), *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001), *Smith v. Grosse*, 205 F.3d 1045 (8th Cir. 2000), *Thompson v. Calderon*, 120 F.3d 1045, 158-59 (9th Cir. 1997), and *Drake v. Francis*, 727 F.2d 990, 994 (11th Cir. 1984). Among these cases, only *Bradshaw v. Stumpf* arguably cites "clearly established Federal law, as determined by the Supreme Court" on the issue in question. 28 U.S.C. § 2254. That case held that the prosecutor's inconsistent positions in two cases did not void a defendant's guilty plea. *Bradshaw*, 545 U.S. at 186-87. While the Court acknowledged that the prosecutor's inconsistent positions could impact the lower court's imposition of a capital sentence (a point on which Justice Souter expounded in his concurrence), it also stated that any resolution of the issue would be premature and, as a result, the Court "express[ed] no opinion on

Therefore, we uphold the district court's decision to deny petitioner's eighth ground for relief.

**F. Due Process Violation:  Newly Discovered Evidence and Perjured Testimony**

In his ninth ground for relief, Blalock argues that McCauley's and Johnson's statements

during their presentence report interviews constitute new evidence, entitling Blalock to a new trial.

According to Blalock, the statements are "[e]vidence which was unavailable" because his co-

defendants "were unavailable and could not be allowed to be compelled to testify."  (Br. for Pet'r

at 37.)  He also alleged that this evidence "proved that petitioner's conviction was based on perjured

testimony."  (*Id.* at 38.)

Overruling this assignment of error, the Ohio Court of Appeals explained:

> In his first assignment of error, defendant argues that his conviction is based
> on perjured testimony and that he is entitled to a new trial based on newly discovered
> evidence.  The State maintains that the statements made by the two co-defendants
> were available prior to trial and are not new evidence.
>
> The decision whether to grant or deny a motion for new trial on the basis of
> newly discovered evidence is committed to the sound discretion of the trial court.
> *State v. Matthews* (1998), 81 Ohio St.3d 375, 691 N.E.2d 1041.  An appellate court
> will not reverse a trial court's denial of a motion for new trial absent an abuse of that
> discretion. *State v. Hawkins* (1993), 66 Ohio St.3d 339, 350, 612 N.E.2d 1227.  An
> abuse of discretion is more than a mere error in judgment; it implies that a court's

---

whether the prosecutor's action amounted to a due process violation, or whether any such violation would have been prejudicial." *Id.* at 187 (remanding the question of how a witness's testimony and the prosecutor's conduct in the two cases "relate to Stumpf's death sentence in particular"); *see also Fotopoulos v. Sec'y, Dep't of Corrections*, 516 F.3d 1229, 1235 (11th Cir. 2008) (reversing the district court's grant of habeas in part because "the *Bradshaw* Court did not hold that the use of inconsistent theories in the prosecution of two defendants violates the right to due process"). *But see Smith v. Groose*, 205 F.3d 1045, 1049 (8th Cir. 2000) (holding, under pre-AEDPA standard of review, that the "Due Process Clause forbids a state from using inconsistent, irreconcilable theories to secure convictions against two or more defendants in prosecutions for the same offenses arising out of the same event").

ruling is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.

A defendant seeking a new trial based on the ground of newly discovered evidence bears the burden of demonstrating to the trial court that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence. *State v. Petro* (1947), 148 Ohio St. 505, 76 N.E.2d 370; *Hawkins*, *supra* at 350, 612 N.E.2d 1227.

With these principals [sic] in mind, we proceed to evaluate whether the statements made by two of the co-defendants constitute newly discovered evidence which would have affected the outcome of the trial.

Here, Ernest McCauley, in his statement to the probation officer on October 3, 2001, indicated that Arketa Willis called him on March 23, 2001, told him that she had shot the victim, and asked him to come over. He further indicated that he and Dion Johnson went to Willis' house and then called defendant to come over. He stated that he, Johnson and the defendant merely moved the victim's body into the back of the truck.

Dion Johnson, in his statement to the probation officer on August 16, 2001, indicated that he was cutting the defendant's hair when he received a phone call from McCauley telling him that Willis had shot someone. He indicated that he and the defendant went over to the scene and helped to move the body into the truck. Johnson testified to essentially the same facts at McCauley's subsequent trial which began on September 17, 2002.

Defendant claims that McCauley's and Johnson's statements to the probation officer and Johnson's trial testimony amounted to exculpatory evidence which shows that he is innocent of the offenses for which he has been convicted. He claims that their statements demonstrate that Willis and/or McCauley are the ones responsible for the victim's death and that his conviction is based on perjured testimony. We are not persuaded that defendant's "newly discovered evidence" would have affected his trial result. First, Johnson's trial testimony and the statements made by McCauley and Johnson in the pre-sentence reports, which name Willis as the one who killed Howard Rose, offer no new revelations. McCauley and Johnson provided the same story to the police in videotaped statements taken by the police which were given to defendant prior to trial. Johnson's trial testimony and the contents of the pre-sentence

report only corroborate statements made by the co-defendants which were known to the defendant prior to trial.

Because the contents of the co-defendant's statements were known by the defense prior to and at trial, the statements contained in the pre-sentence reports and Johnson's trial testimony cannot be described as "new evidence" that "has been discovered since trial" and that "could not in the exercise of due diligence have been discovered prior to trial." *State v. Scott* (Sept. 21, 2001), Mahoning App. No. 98 CA 124. Accordingly, the trial court did not abuse its discretion in denying the defendant's motion for a new trial. *See Ibid*; *State v. Smith* (May 10, 2001), Cuyahoga App. No. 78229; *Holden v. Ohio Bureau of Motor Vehicles* (1990), 67 Ohio App.3d 531, 587 N.E.2d 880.

*Blalock*, 2003 WL 21360467, at *1-2.

In his arguments to the magistrate judge, Blalock focused on his actual innocence and Ohio precedents that, he argued, should have led the state court to regard the availability of McCauley and Johnson as "new evidence." (*See* J.A. at 121-129 (Traverse Brief); 566-72 (Objections to Magistrate Judge's Report and Recommendation).) Therefore, in response to this claim, the magistrate judge noted that "a showing of actual innocence based on newly discovered evidence is not sufficient to warrant habeas relief," and that Blalock had failed to demonstrate "by clear and convincing evidence that the state appellate court erred in finding that the 'new evidence' cited by Blalock would [not] [sic] have affected the result of the trial." (J.A. at 168, 171, 545.) *See also* 28 U.S.C. § 2254(d)(2) (habeas court must find that the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding").

In her second Report, the magistrate judge also provided a dispositive response to Blalock's argument that state court precedents provided an avenue to federal relief:

In reviewing the decision of state courts, the court does not consider questions of state law:

> "[F]ederal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764 (1990); *see also Pulley v. Harris*, 465 U.S. 37, 41 (1984). . . . [I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.

> *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Thus, whether the trial court erred under Ohio law by failing to grant Blalock a new trial is a question beyond the jurisdiction of this court.

(J.A. at 543.) The district court agreed with this assessment, noting that Blalock did not even suggest that the state case law he cited provided him with a federal constitutional right. Nevertheless, the district court concluded – and this court agrees – that it does not. (J.A. at 586-87).

Blalock's brief to this court also contains citations to cases that support his argument that McCauley's and Johnson's statements amount to "evidence which proved that petitioner's conviction was based on perjured testimony," entitling him to a new trial. (Br. for Pet'r at 37-38 (citing *Schlup*, 513 U.S. 298; *Giglio*, 405 U.S. at 154-55; *Mooney*, 294 U.S. at 112; *Brown v. Wainwright*, 785 F.2d 1457 (11th Cir. 1986)). For the reasons provided in Section II.B. of this opinion, this argument also fails.

### III. CONCLUSION

For the aforementioned reasons, we **AFFIRM** the district court's denial of Blalock's application for a writ of habeas corpus.