[Cite as *State v. Blalock*, 2014-Ohio-934.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 100194**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## MARCUS BLALOCK

DEFENDANT-APPELLANT

**JUDGMENT:**
REVERSED AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case Nos. CR-01-407194-B and CR-01-407947-C

**BEFORE:** Keough, J., Celebrezze, P.J., and E.A. Gallagher, J.

**RELEASED AND JOURNALIZED:** March 13, 2014

**ATTORNEY FOR APPELLANT**

Paul A. Mancino
Mancino, Mancino & Mancino
75 Public Square, Suite 1016
Cleveland, Ohio 44113-2098

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
By: Mary H. McGrath
Assistant Prosecuting Attorney
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

KATHLEEN ANN KEOUGH, J.:

{¶1} Defendant-appellant, Marcus Blalock, appeals from the trial court's judgment denying his motion for leave to file a motion for new trial, or in the alternative, motion for postconviction relief. For the reasons that follow, we reverse and remand.

## I. Background

{¶2} In May 2001, the Cuyahoga County Grand Jury indicted Blalock, Dion Johnson, Ernest McCauley, and Arketa Willis in Case No. CR-01-407194-B on three counts of aggravated murder with felony murder and firearm specifications, kidnapping with a firearm specification, and aggravated robbery with a firearm specification.[1] It also indicted Blalock, Johnson, and McCauley on weapons charges. The same grand jury also indicted Blalock in Case No. CR-01-407947-C for tampering with evidence and obstruction of justice. The court consolidated Blalock's cases, and he was tried separately from the other defendants.

{¶3} The state dismissed the murder, kidnapping, and robbery charges against Willis in exchange for her plea of guilty to obstruction of justice and tampering with evidence, and her agreement to testify truthfully against Blalock. Willis testified against Blalock; McCauley and Johnson did not testify at his trial.[2]

---

[1]The felony murder specifications were subsequently deleted from the aggravated murder charges, and the first aggravated murder charge was amended to murder.

[2]McCauley was tried after Blalock. He waived his right to a jury and the court directed a verdict of acquittal on the aggravated murder, kidnapping, and aggravated robbery charges and found him guilty of the weapons charge. McCauley then pleaded guilty to tampering with evidence and obstruction of justice.

{¶4}   The charges stemmed from the murder of Howard Rose, a known drug dealer.   On March 24, 2001, Rose's body was found in the back of a burned pickup truck on Interstate 90 just west of Exit 6 in Pennsylvania.   Forensic examination of the body revealed that the cause of death was a single gunshot wound to the back of the head at point blank range.   Tire tracks behind the truck indicated that another vehicle had stopped behind the truck and then proceeded east on Interstate 90.

{¶5}   During the course of the investigation, the Pennsylvania state police learned that the Maple Heights police had responded to an incident on the night of March 23, 2001, at Willis's home.   The next-door neighbor had called the police at approximately 11:20 p.m. to report suspicious activity at Willis's house, where there were two men parked in the driveway.   When the police responded, the car left the scene.   The police pursued the car and apprehended two men — Johnson and McCauley.   Johnson had blood on his clothes.   Both men were arrested.

{¶6}   The police entered Willis's house and found coagulated blood and a pager with blood on it.   They also saw blood on the driveway.

{¶7}   Both McCauley and Johnson gave videotaped statements to the police in which they said that Willis had shot Rose while he was at her house.   McCauley said that Willis called him, told him that she had shot Rose, and asked for help in moving the body, and that he then called Blalock and Johnson to help.   Johnson likewise said that McCauley called him for help with moving a body.[3]

---

[3]Johnson testified at McCauley's trial that he and McCauley went to Willis's house after

{¶8} Willis was interviewed by the police on April 6. She first said that the blood on the driveway was from a dog fight, but then changed her story and said that Blalock had killed Rose in her bed. The police searched her home and found that the bedroom was freshly painted, the bed had a new mattress and box spring, and the driveway had been washed with bleach.

{¶9} Willis was interviewed again on April 9 and told police that Blalock had taken her car with the body to Pennsylvania. She later retracted this statement and said that she was with Blalock when they took the body to Pennsylvania.

{¶10} No physical evidence that linked Blalock to the murder was introduced at trial. The only testimony against Blalock at trial came from Willis, who testified that she was with Rose on March 23 and observed that he had a large amount of cash. She said that Blalock called her in the afternoon looking for drugs, so she gave the phone to Rose. She said that Rose told her that he told Blalock to meet him at Willis's house later, and that Blalock came to her house that evening before she left for work.

{¶11} Willis said that she drove Rose's truck to work and when he did not come to get it after awhile, she called Blalock but got no answer. Willis said that when Blalock eventually answered, she asked him where Rose was, and Blalock told her that he was busy and she should call back. She said that when she called Blalock 30 minutes later, he

---

Willis asked for help moving the body, and that he and McCauley then went to Blalock's house to get him to help.

told her that he would call her back. According to Willis, Blalock called back less than 30 minutes later and told her to come home and bring the truck.

{¶12} Willis said that when she went home, she saw two men sitting in a car outside her house. One of the men was McCauley, who Willis knew. She said that they entered the house together and she saw Rose's body lying on her bed in blood. Willis said that Blalock, who was at her house, told her that he had to "do" Rose.

{¶13} She testified that McCauley and Blalock carried the body in blankets through the kitchen and out the side door to the truck, and with Johnson's help, they got the body into the truck. Willis drove the truck away as the police arrived at her house. She left the truck on a side street after calling a friend, Omar, to pick her up and take her back to work.

{¶14} When she got off work, Willis went home, wiped blood off a doorway, and poured water on the blood in the driveway. When the police arrived later and questioned her about the blood on the driveway, she told them the blood was from a dog fight.

{¶15} Willis said that after the police left, she and Omar went to Blalock's house. Blalock put a can of gas in the trunk of Willis's car and they drove to the truck. Willis said that Blalock then drove the truck, heading east on Interstate 90, and she and Omar followed in the car. At a rest stop, Blalock took the gas can out of Willis's trunk and put it in the truck. Near daylight, he pulled the truck to the side of the road and Willis pulled in behind him. The truck burst into flames and Blalock jumped out and got in Willis's

car. They drove to New York City where they stayed for only four hours before driving back home, arriving back in Cleveland at 8 a.m. on Sunday, March 25.

{¶16} At the conclusion of the trial, the jury found Blalock guilty of all charges. The trial court sentenced him to 15 years to life on the murder charge; life imprisonment with eligibility for parole in 20 years on each of the aggravated murder charges; 10 years imprisonment on each of the aggravated robbery and kidnapping charges; and 12 months imprisonment on the weapons charge; all to be served concurrently but consecutive to the mandatory three-year sentence on the firearm specifications. In Case No. CR-01-407947-C, the trial court sentenced Blalock to concurrent terms of five years on the tampering with evidence and obstructing justice charges, to be served consecutive to the sentence in the other case.

{¶17} On appeal, this court reversed Blalock's conviction in Case No. CR-01-407947-C for obstructing justice on sufficiency grounds; the court affirmed the other convictions. *State v. Blalock*, 8th Dist. Cuyahoga Nos. 80419 and 80420, 2002-Ohio-4580. It also found that the trial court erred by ordering the sentence in Case No. CR-01-407947-C to be served consecutive to the sentence in Case No. CR-01-407194-B and reversed and remanded for resentencing in Case No. CR-01-407947-C. *Id.* The Ohio Supreme Court dismissed Blalock's appeal as not involving any substantial constitutional question. *State v. Blalock*, 98 Ohio St.3d 1461, 2003-Ohio-644, 783 N.E.2d 520.

{¶18} On February 21, 2002, Blalock filed a motion for a new trial, or in the alternative, petition for postconviction relief. In his motion, Blalock argued that he had obtained the presentence reports from McCauley and Johnson's files, and both men had reported that they had been asked to help move Rose's body after Willis shot him. Specifically, McCauley stated that "Willis told him what happened and asked him to come over. He stated that he and Dion Johnson then went to her house and shortly thereafter, he contacted Blalock." Johnson stated that "McCauley called and stated to come over because he had a 911 emergency. McCauley stated that Willis had killed someone * * *." Johnson testified to the same effect at McCauley's trial. In his motion, Blalock argued that he was entitled to a new trial because this was exculpatory information that had only come to light after the trial and showed that Willis had perjured herself at trial and that he was innocent of the offenses.

{¶19} The trial court denied Blalock's motion without a hearing, finding that he had "cite[d] no new information which would warrant a new trial." The trial court also denied the postconviction petition without a hearing, ruling that Blalock had failed to produce evidence outside the record that would warrant a hearing.

{¶20} This court affirmed on appeal. *State v. Blalock*, 8th Dist. Cuyahoga Nos. 82080 and 82081, 2003-Ohio-3026. This court found that Johnson and McCauley's statements to the probation officer and Johnson's trial testimony offered no new revelations and only corroborated statements made by Johnson and McCauley to the police in videotaped statements that were produced to Blalock prior to trial. This court

concluded that the statements contained in the presentence reports and Johnson's trial testimony could therefore not be described as new evidence that has been discovered since trial. The Ohio Supreme Court subsequently declined to exercise jurisdiction. *State v. Blalock*, 100 Ohio St.3d 1485, 2003-Ohio-5992, 798 N.E.2d 1093.

{¶21} On October 28, 2004, Blalock filed a petition for a writ of habeas corpus in the federal district court. The magistrate judge issued a report and recommendation on May 13, 2005, recommending that Blalock's petition be denied. She found that Blalock had procedurally defaulted on four claims, and that Blalock's remaining claims "did not present decisions that were contrary to, or involved unreasonable applications of, clearly established federal law, or that were based on unreasonable determinations of the facts based on the evidence." *Blalock v. Wilson*, N.D.Ohio No. 1:04CV2156, 2005 U.S. Dist. LEXIS 9418 (May 13, 2005).

{¶22} Blalock subsequently objected to the magistrate's findings and in July 2005, filed a motion to expand the record to require the warden of the Lake Erie Correctional Institution to produce a tape recording of conversations between McCauley and Willis on May 21, 2005, while McCauley was incarcerated at that institution.[4] Blalock contended the recording established his actual innocence of the offenses.

{¶23} In her second report and recommendation regarding Blalock's habeas petition, the magistrate quoted extensively from the transcript of the recording, some of

---

[4]The motion was made moot when the warden filed a recording of the conversations in question.

which contained McCauley's expressions of guilt about involving Blalock in the matter.

For example, at one point McCauley said to Willis:

> MR. McCAULEY: That really bothers me. If it was a different situation it probably wouldn't even bother me. But it bothers me because what you not seeing is I asked him to help me to save you. And at the cost of saving you, he lost his life. That's what bothers me more than anything, baby, and that's what I need you to think about. That's why — that's what bothers me more than anything. I mean, that really hurts me.
>
> MS. WILLIS: Uh-huh.
>
> MR. McCAULEY: You understand? Do you kind of feel what I'm saying now?
>
> MS. WILLIS: Yeah.
>
> MR. McCAULEY: Now, see you didn't probably look at it like that, did you?
>
> MS. WILLIS: Yeah, I did thought about that but I mmmm.
>
> MR. McCAULEY: Oh, you have?
>
> MS. WILLIS: Yeah.

{¶24} At another point, McCauley questioned Willis about what he did not know about the murder:

> MR. McCAULEY: I don't know everything evidently. Just like one letter I wrote, let me give you an example, right?
>
> MS. WILLIS: Uh-huh.
>
> MR. McCAULEY: I wrote you a letter and I asked you what was to gain in it. And you just told me right now you don't even want to talk about it, you'll let me know when the time is right, you'll just let me know. And I never went back to that, asking about 'cause I was said okay, well she'll let me know. And you just never told me.

MS. WILLIS: Uh.   There ain't no gain in it. There was none.

MR. McCAULEY: There wasn't no gain in it at all?

MS. WILLIS: No.

MR. McCAULEY: Well, if there weren't no gain in it and it lead me to believe that you must have hated him just as much as you hated Mark.   That assumed to be true, baby?

MS. WILLIS: No.

**{¶25}**   The discussion continued:

MR. McCAULEY: * * * When you said people thinking, you said they thinking you what now?

MS. WILLIS: Stupid.

MR. McCAULEY: Stupid for what?

MS. WILLIS: Stupid for lying.

MR. McCAULEY: Just be real with me.   This is why I talk to you because I want to believe that you going to be all the way real with me no matter what you say.   Just tell me how you feel.   Go ahead.

MS. WILLIS: Like when I even thought about trying to help Mark —

MR. McCAULEY: Right.

MS. WILLIS: And I knew it was like, can get me in trouble.   They was like it's gone, I guess it was like every person was for theirself and it just — I happened to get only the four years.   It could have been the other way and I could have been getting a lot of time.

MR. McCAULEY: What you mean —

MS. WILLIS: They say that I should —

MR. McCAULEY: Okay.   Go ahead.

MS. WILLIS: So they're thinking I should just do my four and then don't worry about it.

MR. McCAULEY: Right, right. But see they're not looking at the — see again, every person wasn't for theirself. Everybody told a story because you started off telling a story. Remember I told you that?

MS. WILLIS: Right.

MR. McCAULEY: Okay.

MS. WILLIS: That's what I'm saying. Then it's like —

MR. McCAULEY: Let me help you understand it better. Let me help you understand it better, alright?

MS. WILLIS: Yeah.

* * *

MR. McCAULEY: Nobody was going to testify against you. I explained that clearly in my letter. There was —

MS. WILLIS: Yeah, but I didn't know that then.

MR. McCAULEY: Okay but now, thank you.

MS. WILLIS: It was like everybody — I felt everybody — when everybody said a story after me, I felt like it was like every man for theirself and when I had got the deal and I was like well, I know they going to say I told like 50 different stories. So I ain't think — I'm for real in my heart of heart, I ain't think no jury would believe me to convict anybody. Know what I mean?

MR. McCAULEY: I know that. I know that.

MS. WILLIS: But it turned around that they did. I mean that's why I didn't even cry or nothing or be, you know, like remorseful and all that.

MR. McCAULEY: Right.

MS. WILLIS: Cause I'm thinking they ain't going to believe nothing, but they did.

MR. McCAULEY: Right.

MS. WILLIS: And I'm like, dang, know what I mean? I couldn't believe it myself and I'm like, well, I'm going to take this deal 'cause I don't want to go on trial, so I took a deal.

{¶26} At another point, McCauley asked Willis when she decided to blame Blalock for the murder:

MR. McCAULEY: That's what led me to help you. You say, don't worry about that. If the police come down on me I'm going to take out, I'm going to take out. Where'd the turning come in? Where did you decide to turn? Because I'm saying to myself, if it wasn't Blalock helping us, then it make me feel like it would have been me. Which you would have did — what you would have turned — would I have been the one in?

MS. WILLIS: Inaudible.

MR. McCAULEY: Would I have been the one faced — when did you take the turn at? When did you decide to take the turn and put it on him?

MS. WILLIS: I don't know.

MR. McCAULEY: That's the part I'm lost in. That's where I'm really lost at.

MS. WILLIS: It wouldn't have been you.

{¶27} At one point, although Willis did not explicitly confess, she seemed to admit that she murdered Rose:

MR. McCAULEY: And I know this, because that's who I am. And that's how I come to learn about you. I know you got a conscience. I know you can care about certain things, no matter what you done did. Okay, somethings you can't take back, maybe, but I know you care. Somewhere down inside, you do care and you can make all the difference in the world. You understand what I'm saying?
MS. WILLIS: Uh-huh.

MR. McCAULEY: Listen. It's not even in his life, in my life. I was saying this the other day in my mind. I was saying, she going to realize if you — if you free, you done took a soul right?

MS. WILLIS: Uh-huh.

MR. McCAULEY: But you can free two souls to save another soul. Do you know what that means?

MS. WILLIS: What?

MR. McCAULEY: Okay, you took a soul.

MS. WILLIS: Right.

MR. McCAULEY: Which would be Howard.

MS. WILLIS: Uh-huh.

MR. McCAULEY: You can save two souls, which would be me and Mark —

MS. WILLIS: Uh-huh.

MR. McCAULEY: To free a soul. Who was to free the soul?

MS. WILLIS: Is mine in bondage?

{¶28} The magistrate judge found that after expanding the record to include the transcript of the telephone conversations, there was new evidence of actual innocence that was sufficient to overcome Blalock's procedural defaults on several of his claims. Nevertheless, after reviewing these claims on their merits, she concluded that the previously-defaulted claims did not present decisions that were contrary to, or involved unreasonable applications of clearly-established federal law. With regard to Blalock's actual innocence claim based on the telephone transcripts, the magistrate judge concluded

that "these accounts indicate that the state of Ohio may have convicted the wrong person when it found Blalock guilty of the murder of Rose." *Blalock v. Wilson*, N.D. Ohio No. 1:04 CV 2156, 2006 U.S. Dist. LEXIS 65794 (June 30, 2006), incorporating the magistrate judge's report and recommendation. Nevertheless, the magistrate judge recommended that Blalock's writ of habeas corpus be denied because a showing of actual innocence, absent an underlying federal constitutional violation, is insufficient to warrant habeas relief.

**{¶29}** The district court adopted the magistrate's recommendation. *Blalock v. Wilson*, N.D. Ohio No. 1:04 CV 2156, 2006 U.S. Dist. LEXIS 65794 (June 30, 2006). It found that the magistrate's conclusion was supported by the record and controlling law. With respect to the telephone transcript, the district court stated that "[t]he court is cognizant of Petitioner's new evidence of actual innocence, and agrees with the magistrate judge that 'these accounts indicate that the state of Ohio may have convicted the wrong person when it found Blalock guilty of the murder of Rose.'" *Id.* at *16. Nevertheless, the district court found that while the evidence was sufficient to excuse the procedural defaults, Blalock had not shown that his conviction was contrary to, or involved an unreasonable application of federal law and, further, that a showing of actual innocence, absent an underlying constitutional violation, is insufficient to warrant habeas relief. *Id.*

**{¶30}** The Sixth Circuit Court of Appeals affirmed. *Blalock v. Wilson*, 320 Fed. Appx. 396, 2009 U.S. App. LEXIS 7567 (6th Cir. 2009). Although the court did not expressly opine, as had the magistrate judge and district court, that the telephone transcript

indicated the state of Ohio may have convicted the wrong person, the court quoted extensively from the transcripts. It also noted that although Willis never explicitly confessed, she stated, apparently in reference to her attorney and/or the police, that she "lied to them to the last day," and that she was surprised the jury convicted Blalock in light of the many stories she told. *Id.* at *24. With respect to Blalock's actual innocence claim based on the transcript, the Sixth Circuit found that its decision was limited to whether the additional evidence established a federal constitutional due process violation,[5] and that it was a separate question as to whether those conversations entitled Blalock to a new trial under Ohio law. The United States Supreme Court subsequently denied a writ of certiorari. *Blalock v. Wilson*, 558 U.S. 1117, 130 S.Ct. 1052, 175 N.E.2d 892 (2010).

{¶31} On December 9, 2005, while his habeas petition was pending, Blalock filed in the trial court a second motion for leave to file a motion for a new trial, or in the alternative, petition for postconviction relief, based on the telephone transcript and various letters between Willis and McCauley. In one of the letters, Willis told McCauley "[y]ou just don't know how differently I look at life now. I guess when you take a life and have to live with it, you really don't have a choice but to look at it different." In another letter, she told McCauley, "[a]ll those lies I told, I never would have guess [sic] they'd believe my statement. I just thought I'd get a plead [sic] bargain and they would find everyone

---

[5]The Sixth Circuit held that the government must have "knowingly" used perjured testimony at trial in order for the presentation of that testimony to constitute a due process violation. Because Blalock produced no evidence that the prosecutor played a knowing role in the presentation of the allegedly perjured testimony, the court rejected Blalock's claim that the testimony, in and of itself, violated the constitution. *Id.* at *47.

not guilty because of all the dishonesty in all of my written statements." In several letters, she told McCauley "you're doing time because of me" and that she knew he loved her in 2001 "because had you not, you wouldn't be in jail today." In a letter dated March 23, 2005, Willis told McCauley, "Today always makes me sad. I not only think of my life and the life loss, I think of you, Marc and Deon and y'all family. I hurt a lot of people and I am sorry. * * * You had my back and I got yours!"

{¶32} In February 2006, Blalock moved to supplement the record to include transcript pages from McCauley's trial that he argued showed that the prosecutor had taken inconsistent positions at his trial and McCauley's as to who murdered Rose. A review of those pages demonstrates that the prosecutor argued at McCauley's trial that McCauley had aided and abetted the murder by giving the gun to Willis to kill Rose, despite the state's assertion at Blalock's trial that Blalock was the killer.

{¶33} The state subsequently filed a motion to dismiss Blalock's motion. It argued that Blalock had failed to demonstrate that he was unavoidably prevented from discovering the new evidence upon which his motion was based because he knew of Willis at the time of trial and had cross-examined her. The state also argued that Blalock's motion was barred by res judicata because his claim that Willis was the murderer was raised in his first motion for a new trial and rejected.

{¶34} In February 2007, the state supplemented its motion to dismiss with a statement from McCauley, notarized by his lawyer, dated August 21, 2006. In this statement, McCauley said that his telephone conversations with Willis were an attempt to

set her up to make it appear that she committed perjury during Blalock's trial, and that Blalock "without question murdered Mr. Howard Rose the victim in cold blood."[6]

{¶35} The trial court set the matter for hearing on April 13, 2007, but the hearing never took place.[7]

{¶36} A year later, on April 30, 2008, Blalock supplemented his motion for a new trial with a letter to him from McCauley dated August 23, 2006, two days after McCauley made his notarized statement. In this letter, McCauley told Blalock "I did what I needed to do. I wrote a new statement that corroborrate [sic] Willis [sic] story."

{¶37} On September 4, 2009, Blalock pro se requested that the judge reset the hearing on his motion for leave to file a motion for new trial, or alternatively, petition for postconviction relief. The state opposed Blalock's motion for a hearing and on October 5, 2009, the trial court denied Blalock's motion without a hearing.

{¶38} This court affirmed on appeal. *State v. Blalock*, 8th Dist. Cuyahoga No. 94198, 2010-Ohio-4494. This court ruled that Blalock's claim that Willis was the shooter was barred by res judicata because he had raised that issue in his first motion for a new trial. This court further ruled that the telephone transcript did not prove Blalock's innocence because the district court had ultimately denied Blalock's petition for habeas

---

[6]McCauley was resentenced on August 21, 2006, the same day he made his statement. In Case No. CR-01-407194-B, he was sentenced to 6 months on having a weapon while under a disability, an agreed sentence and a reduction from his prior sentence of 12 months. In Case No. CR-01-407947-C, he was sentenced to six years incarceration, also an agreed sentence and a reduction from his prior sentence of eight years.

[7]The trial court was apparently in trial on April 13 and never reset the matter for hearing.

relief, and subsequent to the telephone conversation, McCauley had provided a written statement attesting that Blalock had murdered Rose. Finally, this court ruled that Blalock's argument about the prosecuting attorney's apparently inconsistent positions at his and McCauley's trial regarding who was responsible for Rose's murder was barred by res judicata because Blalock could have raised this argument on direct appeal.

{¶39} On April 26, 2013, Blalock filed a third motion for leave to file a motion for new trial based on newly discovered evidence or, in the alternative, petition for postconviction relief. The new evidence was a notarized affidavit from Shannon Drake dated April 15, 2013. In his affidavit, Drake, a released felon, averred that he was incarcerated at the Lake Erie Correctional Institution from 2004 to 2008. Drake said that McCauley, who was also incarcerated there, told him that Blalock's only involvement in the case was to help clean up Willis's house and move the body after Willis killed Rose. Drake also said that he overheard telephone conversations between McCauley and Willis, and that he read some of the letters Willis sent to McCauley. Drake stated that Willis set up Blalock because she became angry when Blalock, with whom she was romantically involved, married another woman, and because she thought that Blalock had abused her.[8]

{¶40} The state opposed Blalock's motion, arguing that Blalock was simply "trotting out" the same argument of his innocence that the courts had previously rejected.

---

[8]In a letter from McCauley to Willis dated January 6, 2005 (attached to Blalock's second motion for leave to file a motion for new trial), McCauley mentioned Willis's "unforgiving hate" for Blalock because of her belief that he was involved in the murder of her daughter's father, and Blalock's romatic involvement with other women while he was romantically involved with Willis.

The state also argued that Drake's affidavit was meaningless in light of McCauley's statement that Blalock had murdered Rose.

{¶41} In his reply, Blalock argued that McCauley's self-serving affidavit was written by McCauley the day he was resentenced, and that McCauley had subsequently told Blalock's counsel that he made the affidavit at the request of the prosecutor in order to receive a lesser sentence, and that he had disavowed the truthfulness of his affidavit.

{¶42} The trial court subsequently issued a judgment entry that stated, "[d]efendant's 4/26/13 motion for leave to file a motion for a new trial based upon newly discovered evidence or in the alternative, petition for postconviction relief is hereby denied without hearing: res judicata." Blalock appeals from this judgment.

## II. Analysis

{¶43} By his motion, Blalock sought leave to file a motion for a new trial pursuant to Crim.R. 33 or, in the alternative, a petition for postconviction relief pursuant to R.C. 2953.21. In his third assignment of error, Blalock contends that he was denied due process of law when the trial court failed to grant an evidentiary hearing on his motion. We consider this assignment of error first because it is dispositive.

A. New Trial Motion

{¶44} A Crim.R. 33 motion for a new trial is addressed to the sound discretion of the trial court and will not be reversed absent an abuse of discretion. *State v. Schiebel*, 55 Ohio St.3d 71, 564 N.E.2d 54 (1990). "The term 'abuse of discretion' is one of art, 'connoting judgment exercised by a court, which does not comport with reason or the

record.'" *State v. Alexander*, 11th Dist. Trumbull No. 2011-T-0120, 2012-Ohio-4468, ¶ 10, quoting *State v. Underwood*, 11th Dist. Lake No. 2008-L-113, 2009-Ohio-2089, ¶ 30.

> Crim.R. 33(A)(6) permits a convicted defendant to file a motion for a new trial upon grounds that new evidence material to the defense has been discovered that the defendant could not with reasonable diligence have discovered and produced at trial.
>
> Pursuant to Crim.R. 33, motions for a new trial based on newly discovered evidence shall be filed within 120 days of the verdict. A defendant who seeks a new trial after the 120-day time period must first obtain leave from the trial court, demonstrating by clear and convincing evidence that he or she was unavoidably prevented from timely filing the motion for a new trial or discovering the new evidence within the time period provided by Crim.R. 33(B). "[A] party is unavoidably prevented from filing a motion for a new trial if the party had no knowledge of the existence of the ground supporting the motion for a new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for new trial in the exercise of reasonable diligence." *State v. Walden*, 19 Ohio App.3d 141, 145-146, 483 N.E.2d 859 (10th Dist.1984).
>
> A defendant is entitled to a hearing on his motion for leave if he submits "documents that on their face support his claim that he was unavoidably prevented from timely discovering the evidence" at issue. *State v. McConnell*, 170 Ohio App.3d 800, 2007-Ohio-1181, 869 N.E.2d 77, ¶ 19 (2d Dist.). Although a defendant may file his motion for a new trial along with his request for leave to file such motion, "the trial court may not consider the merits of the motion for a new trial until it makes a finding of unavoidable delay. * * * If the defendant submits documents that on their face support his claim that he was unavoidably prevented from timely discovering the evidence, the trial court must hold a hearing to determine whether there was unavoidable delay." *State v. Stevens*, 2d Dist. Montgomery Nos. 23236 and 23315, 2010-Ohio-556, ¶ 11.

*State v. Brown*, 8th Dist. Cuyahoga No. 95253, 2011-Ohio-1080, ¶ 12-14.

{¶45} Here, the trial court apparently proceeded to the merits of Blalock's motion for a new trial without first holding a hearing to determine whether Blalock was unavoidably prevented from discovering this evidence. Blalock was entitled to such a

hearing because the document attached to his motion for leave, Drake's affidavit, demonstrated on its face that Blalock could not with due diligence have discovered this evidence within 120 days of his September 2001 verdict. Accordingly, the trial court abused its discretion in ruling on the merits of Blalock's motion for a new trial without first having a hearing on Blalock's motion for leave to file the motion.

{¶46} In light of the record in this case, we cannot find the court's failure to be harmless error. *See, e.g., Alexander*, 11th Dist. Trumbull No. 2011-T-0120, 2012-Ohio-4468 (harmless error in not having hearing on the issue of unavoidable delay because the new evidence of a witness's recantation of trial testimony would not have materially affected the outcome of the trial because the witness was not the only witness who implicated the defendant in the murder). The record in this case is replete with new evidence that is material to the issues at trial and casts serious doubt on the validity of the jury's verdict. Furthermore, had the evidence of Willis's motivation to lie been available at trial, there is a strong possibility that the trial would have produced a different result.

{¶47} And, although the merits of Blalock's motion are not before us because the trial court did not make a finding of unavoidable delay, we note that it is not immediately apparent, as the state asserts and the trial court found, that Blalock's claim is barred by the doctrine of res judicata. "Res judicata is a rule of fundamental and substantial justice, that 'is to be applied in particular situations as fairness and justice require, and that * * * is not to be applied so rigidly as to defeat the ends of justice or so as to work an injustice.'" (citations omitted.) *State v. Simpkins*, 117 Ohio St.3d 420, 2008-Ohio-1197, 884 N.E.2d

568, ¶ 25. The record in this matter raises lingering concerns about the validity of Blalock's conviction so as to render the application of the doctrine of res judicata to his motion for a new trial an injustice. *See, e.g., State v. Tinney*, 5th Dist. Richland No. 2011 CA 41, 2012-Ohio-72, ¶ 31 (res judicata not applicable to defendant's second motion to withdraw his guilty plea in light of lingering concerns by police about defendant's guilt and the issue of defendant's mental capacity when he entered his plea).

B. Petition for Postconviction Relief

{¶48} Blalock's motion alternatively requested leave to file a petition for postconviction relief. We review the trial court's denial of Blalock's motion for leave to file a petition for postconviction relief without an evidentiary hearing for an abuse of discretion. *State v. Sawyer*, 8th Dist. Cuyahoga No. 91946, 2009-Ohio-2391, ¶ 16.

{¶49} Postconviction relief allows a petitioner to make a collateral civil attack on his criminal conviction by filing a petition to set aside the judgment. R.C. 2953.23 et seq., the postconviction statute, affords relief from judgment where the petitioner's rights in the proceedings that resulted in his conviction were denied or infringed to such an extent the conviction is void or voidable under the Ohio or United States Constitutions. *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967), paragraph four of the syllabus.

{¶50} In his motion for leave to file a postconviction petition, Blalock argued that Drake's affidavit demonstrated that Willis perjured herself at trial and that he should therefore be allowed to file a petition for postconviction relief. Drake's affidavit, as well as the files and records of the case, certainly suggest that she lied. However,

postconviction relief is available only to redress constitutional violations.  A conviction based upon perjured testimony does not implicate constitutional rights absent a showing that the state knew of the perjury.  *State v. Kimble*, 8th Dist. Cuyahoga No. 54154, 1988 Ohio App. LEXIS 3824 (Sept. 22, 1988); *State v. Parker*, 2d Dist. Montgomery No. 25518, 2013-Ohio-3177, ¶ 19; *State v. Clark*, 2d Dist. Montgomery No. 16463, 1998 Ohio App. LEXIS 2326 (May 29, 1998).   Blalock made no assertion in his motion that the prosecution had any knowledge of the alleged perjured testimony, and without such a showing, his remedy is by motion for a new trial under Crim.R. 33.  *Kimble, supra.* Accordingly, the trial court properly denied Blalock's motion for leave to file a petition for postconviction relief.

**{¶51}**  The third assignment of error is sustained.  The first, second, and fourth assignments of error are overruled as moot.

**{¶52}**  Reversed and remanded with instructions for the trial court to hold a hearing to determine whether Blalock was unavoidably prevented from discovering the new evidence presented in his motion for leave to file a motion for new trial.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

KATHLEEN ANN KEOUGH, JUDGE

EILEEN A. GALLAGHER, J., CONCURS;
FRANK D. CELEBREZZE, JR., P.J., CONCURS IN JUDGMENT ONLY