[Cite as *State v. Blalock*, 2017-Ohio-2658.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 104773**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## MARCUS BLALOCK

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-01-407194-B

**BEFORE:** Blackmon, J., Kilbane, P.J., and Laster Mays, J.

**RELEASED AND JOURNALIZED:** May 4, 2017

**ATTORNEY FOR APPELLANT**

Paul A. Mancino, Jr.
Mancino Mancino & Mancino
75 Public Square, Suite 1016
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

Mary McGrath
Assistant Prosecuting Attorney
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113

PATRICIA A. BLACKMON, J.:

{¶1} Marcus Blalock ("Blalock") appeals from the trial court's denial of his third motion for a new trial. He assigns the following errors for our review:

I. [Blalock] was denied due process of law when the trial court failed to follow the mandate from the previous appeal.

II. [Blalock] was denied due process of law when the court ruled that the information supplied did not constitute new evidence which is contrary to the finding in the prior appeal.

III. [Blalock] was denied due process of law when he was not awarded a new trial based on the fact defendant proved he was actually innocent.

IV. The misconduct by the prosecuting attorney requires that [Blalock] be awarded a new trial.

{¶2} Having reviewed the record and pertinent law, we affirm. The apposite facts follow.

{¶3} Following the 2001 shooting death of Howard Rose ("Rose") at the home of Arketa Willis ("Willis"), Blalock, Willis, Ernest McCauley ("McCauley"), and Dion Johnson ("Johnson") were charged with aggravated murder, murder, kidnaping, aggravated robbery, and firearms specifications in Case No. CR-01-407194. The indictment also charged Blalock, McCauley, and Johnson with having weapons while under disability. Additionally, in Case No. CR-01-407947, all four defendants were charged with tampering with evidence and obstruction of justice in connection with the investigation into Rose's death.

## Blalock's Trial

**{¶4}** Both cases against Blalock were consolidated and proceeded to a jury trial on August 31, 2001.[1] Willis testified against Blalock as part of a plea agreement in which the aggravated murder and other charges in Case No. CR-01-407194 were dismissed in exchange for her guilty plea to obstruction of justice and tampering with evidence, and her agreement to testify truthfully against Blalock. McCauley and Johnson did not testify during Blalock's trial.[2]

**{¶5}** The state's evidence indicated that Willis spoke with the police twice after the shooting and eventually told them that she was afraid of Blalock and he was the person who killed Rose. On the day of the shooting, Rose had approximately $1,000 in cash and $3,000 in cocaine. Blalock called Willis asking if she knew anyone who had

---

[1]Blalock waived his right to a jury trial on the charge of having a weapon while under disability.

[2]The charges against McCauley proceeded to a separate trial on September 18, 2001. The evidence in that trial included Willis's testimony that after setting up the drug purchase, she went to work. When Rose did not meet her at work after the meeting, she called Blalock and he told her to come home. "[W]hen she arrived, she discovered Blalock, McCauley, and Dion Johnson there, along with Rose's corpse. Blalock admitted that he shot Rose." *See State v. McCauley*, 8th Dist. Cuyahoga No. 80630, 2003-Ohio-3211, ¶ 2. In addition, Johnson testified that McCauley admitted owning the gun. *McCauley* at ¶ 8. McCauley was acquitted of aggravated murder, murder, kidnaping, aggravated robbery, but convicted of having a weapon while under disability in Case No. CR-01-407194. He pled guilty to tampering and obstruction of justice in Case No. CR-01-407947. McCauley was sentenced to a total of nine years. This court affirmed the convictions but reversed and remanded for resentencing. *Id.* Later, on August 21, 2006, McCauley received an "agreed sentence," totaling seven years.

Johnson entered into a plea agreement with the state on August 21, 2001, pleading guilty to tampering with evidence and obstruction of justice in Case No. CR-01-407947, in exchange for the dismissal of charges in Case No. CR-01-407194.

drugs. He then agreed to meet Rose at Willis's house. After Blalock arrived, Willis went to work in Rose's truck. When Rose failed to come to her work place to get his truck, Willis called Blalock several times. He told her he was busy, then called her back, telling her to come home and bring the truck. When she arrived home, Rose was dead and Blalock told her that he had to "do" Rose. Later, Blalock, McCauley, and Johnson carried the body to the truck. Blalock drove Rose's truck eastbound on Interstate 90, with Willis and her friend Omar following. They eventually stopped along the road and Blalock set fire to the truck containing Rose's body. Rose's wallet was never found. *State v. Blalock*, 8th Dist. Cuyahoga Nos. 80419 and 80420, 2002-Ohio-4580 ("*Blalock I*").

{¶6} During his trial, Blalock argued that the only witness to connect him to the death of Rose was Willis and that her testimony was not credible. Blalock was convicted of all charges. In Case No. CR-01-407194, he was sentenced to life imprisonment with eligibility for parole in 20 years on each of the aggravated murder charges, 15 years to life on the murder charge, ten 10 years on the aggravated robbery and kidnapping charges, and 12 months on the weapons under disability charge, plus three-years for the firearm specifications. In Case No. CR-01-407947, he was sentenced to concurrent five-year terms on the tampering with evidence and obstructing justice charges, to be served consecutively to the term imposed in Case No. CR-01-407194.

**Blalock's Direct Appeal**

{¶7} On direct appeal, most of Blalock's arguments pertained to Willis. In relevant part, Blalock asserted that the prosecuting attorney improperly bolstered Willis's testimony after she admitted during cross-examination that she had provided three statements to police and that "basically everything [she] told the police on April 6th was a lie." Blalock also asserted that the prosecuting attorney improperly instructed Willis to identify the true and untrue portions of her statement to police, impermissibly argued that it was the role of the jury and not defense counsel to "label [Willis] a liar," and impermissibly argued that "[t]his is not the work nor is this bullet in the back of the head the work of Arketa Willis." Blalock also asserted that the trial court improperly limited his cross-examination of Willis regarding the penalties she faced prior to her plea, erred in excluding McCauley's out-of-court statement that "Willis admitted to him that she killed Rose," and erred in refusing to instruct the jury that if it found that Willis testified falsely about a material fact, it could disregard her testimony entirely. This court found "no error relevant to [Blalock's] convictions in Case No. CR-407194 for murder, aggravated murder, kidnaping, aggravated robbery and having a weapon while under disability," but reversed Blalock's conviction for obstruction of justice, and remanded for resentencing on the consecutive terms. *See Blalock I* at ¶ 30-31. *Id.*

### Blalock's First Motion for A New Trial

{¶8} On February 21, 2002, Blalock filed a motion for a new trial, or, in the alternative, postconviction relief, in which he argued that after his trial, McCauley and Johnson made statements that exculpated Blalock. According to McCauley's statements

during his presentence report interview, Willis called him on March 23, 2001, and said that she shot Rose and needed him to come over to help her, and that Blalock merely helped move Rose's body. According to Johnson's presentence report interview statements, Johnson was cutting Blalock's hair at Blalock's house and they learned from McCauley that Willis shot someone and they agreed to help her move the body.

{¶9} The trial court denied Blalock's motion without an evidentiary hearing and this court affirmed. *State v. Blalock*, 8th Dist. Cuyahoga Nos. 82080 and 82081, 2003-Ohio-3026 ("*Blalock II*"). This court concluded that this evidence was not new and merely corroborated McCauley's and Johnson's earlier videotaped police interviews that were known to Blalock prior to his trial.

### Federal Proceedings

{¶10} On October 28, 2004, Blalock filed a petition for a writ of habeas corpus in the federal district court. On May 13, 2005, the magistrate judge issued a report and recommendation denying the petition. *Blalock v. Wilson,* N.D.Ohio No. 1:04CV2156, 2005 U.S. Dist. LEXIS 9418 (May 13, 2005) ("*Blalock III*").

{¶11} Blalock objected to the magistrate's report, arguing that he is actually innocent of the offenses. Blalock moved to expand the record to include Willis's taped conversations with McCauley that took place in 2005 while McCauley was incarcerated at the Lake Erie Correctional Institution ("LECI"). The magistrate granted the motion and considered the phone conversations.

{¶12} The magistrate then issued a second report and recommendation. Quoting extensively from the taped conversations, the magistrate found there was "new evidence" of Blalock's actual innocence that included McCauley's expressions of guilt over having involved Blalock in the matter, McCauley's questions to Willis about the circumstances of the murder, Willis's surprise that the jury believed her testimony because she "told 50 different stories," and Willis's statement that she "lied [to her attorneys and/or the police] to the last day."

{¶13} In relevant part, the taped conversation provide as follows:

MR. MCCAULEY: I asked [Blalock] to help us and because of that, he lost his life. And I feel responsible for that.

MS. WILLIS: Uh-huh.

MR. MCCAULEY: I can't but feel responsible for that because just like I asked you to help me do something. And then my dude turn around and say, you did it. Then I'm like I'm going crazy like, oh wait a minute; wait a minute. Ain't no way. You know what I'm saying?

And here it is you sitting there like, well damn — I'm sitting down here and I'm dealing with this because I trusted you. I came to help you. I didn't know what ya'll was going through. You understand what I'm saying?

MS. WILLIS: Uh-huh.

MR. MCCAULEY: And all of a sudden, you doing time for something you didn't do. That would weigh on me because of who I am. And that's what you need to understand about me as a person. And I have a conscience about certain things. You understand what I'm saying?

MS. WILLIS: Uh-huh.

MR. MCCAULEY: Certain things bother me because he entrusted me. * * * In some way, he saved your life just like I did. That's what you not seeing. No matter how you — no matter how much revenge you got in

you. No matter how much you look at the picture and what you know how you try to justify, had I not asked this man to help us —

MS. WILLIS: Uh-huh.

MR. MCCAULEY: — then what do you think would have happened to you? * * *

MR. McCAULEY: That really bothers me. If it was a different situation it probably wouldn't even bother me. But it bothers me because what you not seeing is I asked him to help me to save you. And at the cost of saving you, he lost his life. That's what bothers me more than anything, baby, and that's what I need you to think about. That's why — that's what bothers me more than anything. I mean, that really hurts me.

MS. WILLIS: Uh-huh.

MR. McCAULEY: You understand? Do you kind of feel what I'm saying now?

MS. WILLIS: Yeah.

MR. McCAULEY: Now, see you didn't probably look at it like that, did you?

MS. WILLIS: Yeah, I did thought about that but I mmmm.

MR. McCAULEY: Oh, you have?

MS. WILLIS: Yeah.

{¶14} At another point, McCauley questioned Willis about what was to be gained by the murder and she said that there was no gain. As the conversation continued, Willis explained why she made a deal with the state as follows:

MS. WILLIS: It was like everybody — I felt everybody — when everybody said a story after me, I felt like it was like every man for theirself and when I had got the deal and I was like well, I know they going to say I told like 50 different stories. So I ain't think — I'm for real in my heart of

heart, I ain't think no jury would believe me to convict anybody.  Know what I mean?

MR. McCAULEY:  I know that.  I know that.

**{¶15}** They then acknowledged that a considerable portion of Blalock's trial was spent addressing Willis's lies.  They stated:

MS. WILLIS:  Oh yeah.  He spent like four hours straight discussing my lies.  I'm like well —

MR. McCAULEY:  I — I read it.

MS. WILLIS:  — he ain't going to believe this.  * * *   It ain't I did stuff intentionally, it's like I probably told a story first.

* * *

MR. McCAULEY:  This is my understanding of everything.  What you're not understanding is, no matter how you look at it, everybody trying to do this and that.  Nobody would've had nothing to do if we was never charged with something because of what you told them.  Do you understand that now?  * * *  I'm sitting here.  They was about to let me go.  * * *

But they didn't because Dion decided he wanted to tell them what happened based on what he knew, right?  * * *

I'm thinking I'm going to get a charge of obstruction and tampering.  I'm going to plead out.  Take responsibility and do my time, right.  It didn't work out that way.  * * * .  What bothers me the most, more than the fact that I called Blalock to come, that bothers me.  But what bothers me more than that is something* * * what if he didn't come to help us?

MS. WILLIS: Uh-huh.

McCAULEY:  And he came back.  Then what would've happened?  * * *  [W]hen did you take the turn at?   When did you decide to take the turn and put it on [Blalock]?

MS. WILLIS:  I don't know.

MR. McCAULEY:  That's the part I'm lost in.  That's where I'm really lost at.

MS. WILLIS:  It wouldn't have been you.   * * *

MR. McCAULEY:  Listen.  It's not even in his life, in my life.  I was saying this the other day in my mind.  I was saying, she going to realize if you — if you free, you done took a soul right?

MS. WILLIS:  Uh-huh.

MR. McCAULEY:  But you can free two souls to save another soul.  Do you know what that means?

MS. WILLIS:  What?

MR. McCAULEY:  Okay, you took a soul.

MS. WILLIS:  Right.

MR. McCAULEY:  Which would be Howard.

MS. WILLIS:  Uh-huh.

MR. McCAULEY:  You can save two souls, which would be me and Mark —

MS. WILLIS:  Uh-huh.

{¶16} Additionally within this conversation, McCauley and Willis discussed a novel that Willis is writing that appears to be a fictionalized account of a murder and robbery.

{¶17} After reviewing the additional evidence, the magistrate expressed concern that "the state of Ohio may have convicted the wrong person when it found Blalock guilty of the murder of Rose."  However, the magistrate determined that Blalock was not entitled to relief on the merits, absent an underlying constitutional

violation in the trial process.[3]   The district court concurred with the magistrate's findings

and conclusions in the second report.  *Blalock v. Wilson*, N.D. Ohio No. 1:04 CV 2156,

2006 U.S. Dist. LEXIS 65794 (June 30, 2006) ("*Blalock IV*").

{¶18} These rulings were affirmed on further appeal to the Sixth Circuit Court of

Appeals.  *Blalock v. Wilson*, 320 Fed. Appx. 396, 2009 U.S. App. LEXIS 7567 (6th Cir.

2009) ("*Blalock V*").   The Sixth Circuit additionally concluded that it lacked jurisdiction

to determine whether the trial court erred in denying Blalock's motion for a new trial

since this is a question for the state courts.  *Id.*

### Blalock's Second Motion for A New Trial

{¶19} While the federal habeas proceedings were pending, Blalock filed a   motion

for leave to file a second motion for a new trial in the court of common pleas.   In support

of this motion, Blalock submitted to the court Willis's letters and the transcripts of her

phone conversations with McCauley.   Blalock argued that these materials demonstrated

that Willis shot Rose and Blalock had merely assisted with disposing of Rose's body.

{¶20} In opposition, the state maintained that Blalock's claims were barred

because he had not been unavoidably delayed in presenting the new evidence to the court.

 The state also presented a 12-page handwritten statement from McCauley, dated August

21, 2006 and notarized by McCauley's attorney, Thomas Shaughnessy ("Shaughnessy"),

in which McCauley said that his telephone conversations with Willis were an attempt to

---

[3]The magistrate's second report was not published but is quoted extensively in subsequent federal review.

set her up to make it appear that she committed perjury during Blalock's trial.   According

to McCauley's notarized statement, between 8:00-8:30 p.m, on the night of the shooting,

> [McCauley] called Blalock [who] said he was headed over to [Willis's]
> house to meet some dude about some dope.  * * *  About an hour or so
> later, * * * Blalock called and said he needed my help, he shot the dude in
> the head.   [McCauley] said quit playing.   He said Man, I f—d up.   This is
> for real.   [Blalock] said in about 15 to 20 minutes, call [Johnson] and tell
> [Johnson] that you got an emergency and to come over, you need him [and
> that Willis] called you and said she shot somebody and needed your help
> moving the body.   Meet me at her house.   [McCauley] said are you
> serious?   [Blalock] said, Tell him the broad [Arketa] called you and said
> she shot somebody and needed [Johnson's] help moving the body.   * * *
> [McCauley] said are you serious?   [Blalock] said look man I got to get this
> lame out of her house and we going to need some help because this dude
> isn't small.   [McCauley] said where is [Willis]?   [Blalock] said she at
> work.   [McCauley] said don't be playing. [Blalock] said this is for real.   *
> * *
>
> [McCauley and Johnson went to Willis's house] Blalock was standing there.
>  [McCauley] said what in the f– is going on? [Blalock] said he was trying to
> get the lame to tell him where the dope was in the house.   [Blalock] stated
> the lame was not talking so he layed [sic] him down, shot him in the head
> and went through his pockets.   [Blalock] said he searched the house and
> did not find any dope.   For some reason, [McCauley] didn't believe
> [Blalock] because he had already been home and Blalock was good at lying.
>  * * *
> [Willis] came home [and said to Blalock] where is [Rose]?   As she kept
> walking [McCauley] followed and * * * saw a gun on the kitchen counter.
> [Willis] looked in her room and yelled what is wrong with him.   Blalock
> didn't speak.   She asked Blalock what happened to him.   Blalock said I
> layed [sic] down. * * *
> [Blalock] was indicted of murder.   In truth I felt he got what he deserved
> but when the State of Ohio decided to take me to trial I was livid.   * * *
>
> In 2003 while in prison, Blalock started writing me and saying he needed
> me to help him get out [and ] convince [Willis] to change her statement
> because double jeopardy protects her from murder.   He stated that if that
> does not work convince her to blame Omar because they will never find
> him.

**{¶21}** On October 5, 2009, the trial court denied Blalock's motion without a hearing. This court outlined the totality of the proceedings including the federal proceedings and Blalock's supplemental evidence that included Willis's letters and her transcribed phone calls with McCauley. This court ruled that Blalock's claim that Willis was the assailant was barred by res judicata. *State v. Blalock*, 8th Dist. Cuyahoga No. 94198, 2010-Ohio-4494, ¶ 21 ("*Blalock V*"). The *Blalock V* court explained:

> Blalock previously raised this issue in *Blalock I, supra*, when he argued that he believed Willis was the real shooter. As previously found by this court, Blalock was aware of Willis's existence and the allegations against her prior to trial. This cannot be described as new evidence. Accordingly, we find that the lower court acted properly when it found that Blalock is barred from again raising the claim that Willis was the real shooter. Accordingly, his claim is barred by res judicata.

*Id*. at ¶ 21.

**{¶22}** The *Blalock V* court also rejected Blalock's claim that the trial court violated his right to due process because he offered proof that he was innocent. The court stated:

> [A]fter the phone conversation with Willis, McCauley provided a written statement, notarized by his attorney in which McCauley stated that on March 23, 2001, Blalock without question murdered Rose in cold blood. McCauley further stated that Blalock told him he shot Rose in the head because Rose would not tell him where the drugs were.
>
> Although the magistrate may have believed there were some issues surrounding the phone conversations and inconsistent testimony, the magistrate, as well as the other courts, found that these inconsistencies did not outweigh the evidence.

*Id*. at ¶ 23-25.

**Blalock's Third Motion for A New Trial**

**{¶23}** On April 26, 2013, Blalock filed a motion for leave to file a third motion for new trial based on newly discovered evidence, or in the alternative, a petition for postconviction relief. The new evidence offered in support of this motion was an affidavit from Shannon Drake dated April 15, 2013. Drake averred that while he had been imprisoned with McCauley, he overheard telephone conversations between McCauley and Willis, in which Willis indicated that she set up Blalock to get back at him for ending their relationship and in retaliation for Blalock's prior abuse. In opposition to Blalock's Third Motion for a New Trial, the state insisted that the allegations were res judicata and without merit in light of McCauley's August 21, 2006 notarized statement incriminating Blalock. In his reply, Blalock asserted that McCauley has since denied the contents of the notarized statement.

**{¶24}** The trial court concluded that the motion for leave to file the third new trial motion was barred by res judicata and denied it without a hearing. On appeal, this court concluded that the trial court committed prejudicial error in denying the motion without a hearing to determine whether "Blalock was unavoidably prevented from discovering the new evidence presented in his motion for leave to file a motion for a new trial." *State v. Blalock*, 8th Dist. Cuyahoga No. 100194, 2014-Ohio-934 ("*Blalock VI*"). The *Blalock VI* court stated:

> Blalock was entitled to such a hearing because the document attached to his motion for leave, Drake's affidavit, demonstrated on its face that Blalock could not with due diligence have discovered this evidence within 120 days of his September 2001 verdict. Accordingly, the trial court abused its discretion in ruling on the merits of Blalock's motion for a new trial without first having a hearing on Blalock's motion for leave to file the motion.

*Id*. at ¶ 45. This court noted that "it is not immediately apparent, as the state asserts and the trial court found, that Blalock's claim is barred by the doctrine of res judicata." *Id*. at ¶ 47. This court "[r]eversed and remanded with instructions for the trial court to hold a hearing to determine whether Blalock was unavoidably prevented from discovering the new evidence presented in his motion for leave to file a motion for new trial." *Id*. at ¶ 52.

## June 18, 2014 Hearing on Remand

{¶25} Following this court's remand in *Blalock VI*, the trial court granted Blalock's motion for leave to file a motion for a new trial. The court then held an evidentiary hearing on June 18, 2014, and permitted Blalock to "supplement the record with transcripts from prior appeal." The parties also filed additional briefs.

{¶26} The evidence at the hearing included testimony from Drake who stated that while he and McCauley were imprisoned together at LECI, he observed letters written by Willis and listened in on McCauley's phone conversations in which McCauley plotted to get her to discuss the shooting. According to Drake, "if you read between the lines," Willis admitted killing Rose and stated that she set up Blalock for this crime in retaliation for him beginning a relationship with another woman. Drake also maintained that McCauley told him that Blalock's only involvement in the case was cleaning Willis's house after the murder and moving Rose's body.

{¶27} McCauley testified that the phone calls at LECI are all recorded. He spoke with Willis about Rose's murder, with Drake listening in. McCauley

acknowledged that in the letters and recordings Willis "didn't come right out and say [she] did it." However, he maintained that Willis did tell him immediately after the shooting that she killed Rose, explaining that she shot Rose in her bed. McCauley admitted that on August 21, 2006, or subsequent to his phone conversations with Willis, he made a notarized statement in which he explained that Blalock actually shot Rose. McCauley maintained that the notarized statement was not truthful, and he made it at the request of his attorney and the prosecuting attorney in order to obtain a reduction in his sentence. McCauley also insisted that he did not sign the August 21, 2006 notarized statement and that notarization on the statement by attorney Shaughnessy is not truthful.

{¶28} The trial court called attorney Shaughnessy as a court witness. Shaughnessy testified that he could not recall the statement at issue but that he would not have notarized a statement without examining the identification of the maker of the statement. Shaughnessy also stated that the signature of the notary appeared to be his signature and that he has never notarized a statement in blank.

{¶29} Blalock also testified. He asserted that he arrived at Willis's home, at McCauley's request, after Rose had been murdered in order to help dispose of Rose's body. Blalock stated that he had learned prior to trial that Willis killed Rose and planned to blame him in order to get back at him for ending their relationship. He stated, however, that he could not pursue this defense because his attorneys advised him not to testify at trial, and he did not want to upset his new girlfriend who watched the trial. He

maintained that he had only recently learned from Drake that Willis set him up to take the blame for the murder.

**{¶30}** On June 28, 2016, the trial court denied Blalock's motion for a new trial concluding, "Deft. Has failed to establish that there is any newly discovered evidence warranting a new trial." Blalock appeals from this judgment.

### First Assigned Error — Failure to Follow Law of the Case

**{¶31}** Blalock argues that the trial court erred in failing to follow the law of the case from *Blalock VI*. He also makes the related argument that the trial court erred in failing to find that he presented new evidence under Crim.R. 33(A)(6). Under the doctrine of the law of the case, the decision of a reviewing court in a case remains the law of the case on all legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels. *Nolan v. Nolan*, 11 Ohio St.3d 1, 462 N.E.2d 410 (1984); *State v. Valentine*, 8th Dist. Cuyahoga No. 96047, 2011-Ohio-5828, ¶ 17.

**{¶32}** In *Blalock VI,* this court noted that the merits of the motion were not before the court. *Id*. at ¶ 47. Ultimately, this court reversed and "remanded with instructions for the trial court to hold a hearing to determine whether Blalock was unavoidably prevented from discovering the new evidence presented in his motion for leave to file a motion for new trial." *Id*. at ¶ 52. Thereafter, the trial court ruled that "upon remand from the Court of Appeals, Deft's April 26, 2013 motion for leave to file motion for a new trial is granted." Later, the trial court held an evidentiary hearing on remand to consider whether Blalock was unavoidably prevented from discovering the new evidence

presented. In accordance with the foregoing, the trial court did not deviate from the mandate in *Blalock VI* and did not disregard the law of the case.

**{¶33}** The first assigned error is without merit.

## Second Assigned Error
## Failure to Find that There Is No New Evidence

**{¶34}** Blalock next maintains that the trial court erred in denying his motion for a new trial.

**{¶35}** New trials are governed by Crim.R. 33. Crim.R. 33(A)(6) provides that a motion for a new trial on the ground of newly discovered evidence may be granted only if that evidence:

> (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence.

*State v. Cannon*, 8th Dist. Cuyahoga No. 103298, 2016-Ohio-3173, ¶ 12, citing *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), syllabus.

**{¶36}** Under Crim.R. 33(B), motions for a new trial based upon newly discovered evidence must be filed within one hundred twenty days after the verdict was rendered, unless it appears, by clear and convincing proof, that the movant was unavoidably prevented from discovering the new evidence. A defendant is "unavoidably prevented"from filing a timely motion for new trial if the defendant had no knowledge of the existence of the ground supporting the motion for new trial and could not have learned of the existence of that ground within the time prescribed for filing the motion for

new trial in the exercise of reasonable diligence. *State v. Walden*, 19 Ohio App.3d 141, 145-146, 483 N.E.2d 859 (10th Dist.1984). Res judicata bars all subsequent motions seeking a new trial that are based on claims that were brought or could have been brought on direct appeal or in prior motions filed under Crim.R. 33. *State v. Bridges*, 8th Dist. Cuyahoga Nos. 103634 and 104506, 2016-Ohio-7298.

{¶37} Moreover, the evidence submitted must not be merely cumulative to the evidence presented at trial. *State v. Hale*, 8th Dist. Cuyahoga No. 103654, 2016-Ohio-5837, ¶ 9; *State v. Powell*, 90 Ohio App.3d 260, 264, 629 N.E.2d 13 (1st Dist.1993); *State v. Combs*, 100 Ohio App.3d 90, 652 N.E.2d 205 (1st Dist.1994).

{¶38} The grant or denial of a motion for a new trial on the grounds of newly discovered evidence is within the discretion of the trial judge and this ruling will not be disturbed on appeal absent an abuse of discretion. *State v. Hill*, 64 Ohio St.3d 313, 333, 595 N.E.2d 884 (1992); *State v. Schiebel*, 55 Ohio St.3d 71, 76, 564 N.E.2d 54 (1990). An abuse of discretion is more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶39} In this matter, the record demonstrates that Blalock has been presenting evidence concerning Willis's purported guilt since his trial in 2002. Further, in his direct appeal, most of Blalock's arguments pertained to Willis, because he argued that the prosecuting attorney improperly bolstered Willis's testimony; improperly instructed Willis to identify the true and untrue portions of her statement to police; impermissibly

argued that it was the role of the jury and not defense counsel to "label [Willis] a liar"; and improperly stated that "[t]his is not the work nor is this bullet in the back of the head the work of Arketa Willis."   Also in his direct appeal, Blalock argued that the trial court improperly limited his cross-examination of Willis regarding the penalties she faced prior to her plea, erred in excluding McCauley's out-of-court statement that "Willis admitted to him that she killed Rose," and erred in refusing to instruct the jury that if it found that Willis testified falsely about a material fact, it could disregard her testimony entirely. *Blalock I* .

**{¶40}** Additionally, Blalock raised McCauley's statements concerning Willis's responsibility for the murder again in his motion for a new trial in February 2002.   At that time, he also included Johnson's statements that Willis shot Rose. The motion was denied and this court affirmed in *Blalock II.*   Blalock raised Willis's purported admissions again in his second motion for a new trial, supplementing them with the transcripts of McCauley's and Willis's phone conversations from LECI and letters from Willis to McCauley.   The trial court denied the motion in 2009 and this court affirmed in *Blalock V*.   Although McCauley testified at the June 18, 2014 hearing that he did not sign the April 21, 2006 notarized statement inculpating Blalock, we cannot conclude that the trial court abused its discretion in this matter, as the court learned, after calling Shaughnessy as a court witness, that Shaughnessy does not notarize statements in blank and always checks the identification of affiants whose statements he is notarizing.

**{¶41}** The third motion for a new trial again used this same evidence, as reframed by Drake's claims that he had listened to Willis's conversations with McCauley and also read the letters. Therefore, we cannot conclude that the trial court abused its discretion in determining that Blalock did not meet the requirements of Crim.R. 33, because Blalock had knowledge of this same information since 2002. As this court stated in *Blalock V,* "[a]s previously found by this court, Blalock was aware of Willis's existence and the allegations against her prior to trial. This cannot be described as new evidence." *Id.* at ¶ 21. Moreover, this evidence is merely cumulative of the evidence presented during the trial.

**{¶42}** The second assigned error is without merit.

### Evidence of Actual Innocence

**{¶43}** In his third assigned error, Blalock maintains that the trial court erred in failing to conclude that he had demonstrated he is actually innocent of shooting Rose.

**{¶44}** In *Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), the United States Supreme Court held that a claim of actual innocence based on newly discovered evidence is not a ground for federal habeas relief absent an independent constitutional violation that occurred in the underlying state criminal proceeding. *Accord State v. Watson*, 126 Ohio App.3d 316, 710 N.E.2d 340 (12th Dist.1998). *See also State v. Tolbert*, 1st Dist. Hamilton No. C-960944, 1997 Ohio App. LEXIS 5507 (Dec. 12, 1997) (citing *Herrera* in rejecting a claim of actual innocence based upon impeaching evidence in a motion for a new trial); *Byrd*, 145 Ohio App.3d at 330-331.

Further, the evidentiary threshold for a claim of actual innocence is "extraordinarily high." *Byrd* at 331.

{¶45} Under Crim.R. 33, a motion for a new trial based upon actual innocence must demonstrate the strong probability that newly discovered evidence would have led to a verdict of not guilty. *State v. Cannon*, 8th Dist. Cuyahoga No.103298, 2016-Ohio-3173, ¶ 12, citing *State v. Jalowiec*, 2015-Ohio-5042, 52 N.E.3d 244, ¶ 30 (9th Dist.).

{¶46} In this matter, no constitutional violation has been shown. Moreover, we are unable to conclude that Blalock has met the extraordinarily high burden of demonstrating actual innocence. Likewise, Blalock has not demonstrated the strong probability that newly discovered evidence would have led to a verdict of not guilty. Drake's testimony pertained directly to the phone calls and merely reframed the earlier claims that Willis's phone conversations and letters indicated that she lied about Blalock killing Rose. After these phone conversations, however, McCauley's notarized statement outlining Blalock's guilt was presented to the court. McCauley averred that Blalock was the shooter and that Blalock shot Rose for refusing to tell him where he had hidden the drugs. Although McCauley asserted that he did not sign this document, the evidence demonstrated that attorney Shaughnessy would not notarize a statement in blank. Moreover, although Blalock relies upon the fact that in the recorded conversations, Willis stated that she "lied to the last day," the record demonstrates that during the trial, Willis stated on cross-examination that "basically everything [she] told

the police on April the 6th was a lie," but ultimately, she testified that Blalock killed Rose, and she also incriminated Blalock during McCauley's trial. Morever, in the taped conversations, Willis stated that Blalock came to her home right after she got ready to go to work, and this was consistent with her trial testimony. Further, McCauley stated in the taped conversation that Blalock "came back" to help them with moving the body, and this is consistent with the April 21, 2006 statement.

{¶47} From all of the foregoing, the trial court did not err in failing to find Blalock actually innocent of the offenses.

{¶48} The third assigned error is without merit.

### Claim of Prosecutorial Misconduct

{¶49} Blalock next asserts that the trial court erred in failing to determine that the prosecuting attorney committed misconduct and that this due process violation entitles him to a new trial.

{¶50} A conviction based upon perjured testimony does not implicate constitutional rights and entitle the defendant to a new trial absent a showing that the state knew of the perjury. *Blalock VI* at ¶ 50.

{¶51} In this matter, this court noted in *Blalock VI* that there is no evidence that the prosecuting attorney knew of the alleged perjury. *Id*. The evidence presented at the hearing following our remand in *Blalock VI* likewise failed to demonstrate that the prosecuting attorney knew of any alleged perjury or that the evidence against Blalock was untrue.

**{¶52}** Accordingly, this claim is without merit.

**{¶53}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
PATRICIA ANN BLACKMON, JUDGE

MARY EILEEN KILBANE, P.J., and
ANITA LASTER MAYS, J., CONCUR